Brenda MINNER, Hillard Muttart,
Linda Brennan and James
Brennan, Plaintiffs,

v.

AMERICAN MORTGAGE & GUARAN-
TY COMPANY, a Delaware Corpora-
tion, and Emory Hill Management
Company, a Delaware Corporation,
Defendants.

C.A. No. 96C–09–263–WTQ.

Superior Court of Delaware,
New Castle County.

April 17, 2000.

Robert Jacobs, Esquire, and Thomas Crumplar, Esquire, Jacobs & Crumplar, Wilmington, Delaware, Attorneys for Plaintiffs.

Vincent A. Bifferato, Jr., Esquire, Bifferato, Bifferato & Gentilotti, Wilmington, Delaware, John Parker Sweeney, Esquire, and Tara Sky Woodward, Esquire, Miles & Stockbridge, Baltimore, Maryland, Attorneys for Defendants.

## OPINION AND ORDER

QUILLEN, J.

This is the Court's Opinion and Order on Plaintiffs' and Defendants' respective Motions in Limine to exclude certain expert witnesses. There are twelve Motions. For the reasons stated herein, the two Plaintiffs' Motions are DENIED, one of the Defendants' Motions is GRANTED, seven Defendants' Motions are DENIED in part and GRANTED in part, and two Defendants' Motions are DENIED. An additional Motion by Defendants to strike an affidavit is considered moot.

## FACTUAL OVERVIEW

This case is a so-called "sick building" case. Plaintiffs Hillard Muttart, Linda Brennan and Brenda Minner have filed suit claiming that, while they were working for the Greenwood Trust Company at the Discover Card building, located at 12 Reads Way, New Castle, Delaware, they suffered various illnesses as a result of the conditions in the building.[1] Greenwood Trust leases the building from the owners,

Defendant American Mortgage & Guaranty Company ("AMGC"). The other remaining Defendant, Emory Hill Management Corporation, manages the building for AMGC.

This case deals with complex medical and psychological conditions the Plaintiffs claim they have suffered as a result of the conditions in this building. As noted, the Plaintiffs and Defendants have filed twelve Motions in Limine, attempting to exclude the others' expert witnesses. This is the Court's Opinion on the Motions before it.

## EXPERT TESTIMONY

Expert evidence can be both powerful and misleading because of the difficulty in evaluating it. *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). The identification of which expert testimony should be allowed is a hazardous and ill-defined enterprise. Stephen D. Easton, *"Yer Outta Here!" A Framework for Analyzing the Potential Exclusion of Expert Testimony Under the Federal Rules of Evidence*, 32 U. Rich. L.Rev. 1, 4 (1998). But, "[n]o one will deny that the law should in some way effectively use expert knowledge wherever it will aid in settling disputes. The only question is as to how it can do so best." Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L.Rev. 40, 40 (1901) (hereinafter *"Hand* at ___"). Although the United States Supreme Court[2] has, in the

---

1. Greenwood Trust, originally a Defendant in this case, has been dismissed from this case because the Plaintiffs are prohibited from suing it directly under the workers' compensation statute.

2. The Delaware Supreme Court has stated that because Delaware Rule of Evidence 702

on testimony by experts is identical to its Federal counterpart, the Delaware Courts should look at the U.S. Supreme Court's most authoritative interpretation of the Rule to guide its interpretation. *See M.G. Bancorporation v. LeBeau*, Del.Supr., 737 A.2d 513, 521 (1999).

recent cases of *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*,[3] for the moment, pronounced the way that Trial Judges should handle questions of expert testimony, a review of the historical precedent is still useful to provide background on how Courts have struggled with the need for expert help. Certainly, our present method of using experts as witnesses was not the earliest or only means used. *Hand* at 42. And, all one must do is look to the yellowing pages of the early volumes of the Harvard Law Review to determine that the subject was of great debate at the turn of the Twentieth Century. *See generally,* William L. Foster, *Expert Testimony,— Prevalent Complaints and Proposed Remedies,* 11 Harv. L.Rev. 169 (1897).

Courts have particularly struggled with how expert testimony should be used in the context of a jury trial. Learned Hand writes that in early times, before trial by jury was substantially developed, there appears to have been two modes for the use of expert testimony. *Hand* at 40. The first method, as described by Hand, was to select jurymen who possessed experiences which were especially fitted to the class of facts which were before them. *Id.* The second method was for the Court to call before it the aid of skilled persons whose opinions it might adopt or not as it pleased. *Id. See also,* 7 John H. Wigmore, *Evidence* § 1917 (Chadbourn rev.1978) (hereinafter "Wigmore, *Evidence* § ___"). The first method described above is the so-called "special jury."

Special juries were basically juries of people who were particularly qualified to decide a case. These special juries were exceedingly common in London throughout the Fourteenth Century in trade disputes. *Hand* at 41.[4] To assemble a special jury, the mayor would be called upon to summon a jury of men of the particular trade in question and those tradesmen decided whether the Defendant had offended the trade regulations. *Hand* at 41. This special jury process continued into the Eighteenth Century. In his commentaries, Blackstone describes the special jury process:

> *Special* juries were originally introduced in trials at bar, when the caufes were of too great nicety for the difcuffion of ordinary freeholders; or where the fheriff was fufpected of partiality, though not upon fuch apparent caufe, as to warrant an exception to him ... either party is intitled upon motion to have a fpecial jury ftruck upon the trial of any iffue, as well as the affifes as at bar; he paying the extraordinarily expenfe, unless the judge will certify ... that the caufe required fuch fpecial jury.[5]

3 William Blackstone, *Commentaries,* *357–58.

In Blackstone's time, the mid-Eighteenth Century, when a special jury was called, the Prothonotary or other proper officer of the Court appeared with the freeholder's book and, in the presence of the attorneys, indifferently took the names of 48 of the freeholders. *Id.* at 358. Each

---

**3.** 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**4.** Hand credits his research on this point to Professor James Thayer, who, among other things, wrote extensively on the history of the trial and jury system. *See* Thayer, *The Older Modes of Trial,* 5 Harv. L.Rev. 45 (1891), *The Jury and its Development,* 5 Harv. L.Rev. 249 (1892), *The Jury and its Development,* 5 Harv. L.Rev. 357 (1892).

**5.** Hand, discussing Blackstone's view of the jury process, states: "Blackstone speaks of the special jury as still an existing institution, though it had then for the most part been limited to cases where a 'struck' jury is demanded owing to a supposed bias in the sheriff; a form of impanelling a jury which went under the same name as the jury of experts, and which exists today." *Hand* at 42.

of the attorneys were able to strike 12 of the jurors, and the remaining 24 constituted the panel. *Id.* at 358.

The practice of special juries is part of Delaware law. Delaware's special jury practice is "noted in several of Delaware's oldest reported cases decided shortly after the American Revolution." *Haas v. United Technologies Corp.*, Del.Supr., 450 A.2d 1173, 1182 (1982) (citing *Burton's Lessee v. Prettyman*, Del.Supr., 1 Del. Cas. 11 (1793); *Newbold's Lessee v. Stockley*, Del. Supr., 1 Del. Cas. 10 (1783); *Polk's Lessee v. Ross*, Del. Com. Pl., 1 Del. Cas. 40 (1794)). The practice of striking special juries was codified in Delaware in 1810 by statute, but it did no more than codify into statutory law a practice long followed in Delaware Courts as a part of the legal heritage from England. *See Nance v. Rees*, Del.Supr., 2 Storey 533, 161 A.2d 795, 798 (1960). That statute exists still today in a modified form; a special jury can only be used for complex civil cases. *See* 10 *Del. C.* § 4506; Super. Ct. Civ. R. 40(b).[6] Since 1987, the parties no longer have a right to a special jury upon application; the Court, as a matter of discretion, *may* order a special jury on the application of a party. Compare 10 *Del. C.* § 4506 with the former 10 *Del. C.* § 4511(a) as it appeared in the 1953 Delaware Code Annotated; *see* David L. Finger & Louis J. Finger, *Delaware Trial Handbook*, § 6:14 (1994).

Delaware Courts have never favored applications for special juries. *See O'Mallie v. Harlan & Hollingsworth Corp.*, Del. Super., 6 Boyce 312, 99 A. 428 (1916).[7] But, in the memory of some of us, it was still quite common for special juries to be requested in significant monetary cases. These relatively recent cases would include expert testimony as well.[8] Given the expense of a special jury, concern arose over the economic and democratic implications of a jury for the wealthy. And the Twentieth Century, with its industrial, technological, medical, and scientific developments, made the hope of a jury of renaissance men and women a somewhat difficult one.

The second early method as described by Hand was to call before the Court the aid of skilled persons. *Hand* at 40. Experts were thought of as being helpers to the Court and the Court instructed the jury on the points on which such aid was furnished. 7 Wigmore, *Evidence* § 1917 (quoting James Bradley Thayer, *A Selection of Cases on Evidence* 672, note (2d ed.1990)). This type of testimony, in its original and long persisting form, was hardly regarded as evidence to the jury, but as an aid sought by the Court, and thus collateral to and parallel with the jury itself. 7 Wigmore, *Evidence* § 1917. But by the latter part of the 1700s, the expert took his place as a mere witness to the jury. *Id.*

---

**6.** Delaware has retained all of the fundamental features of the jury system as they existed at common law. *Claudio v. State*, Del.Supr., 585 A.2d 1278, 1298 (1991).

**7.** The Delaware statute granting the right to special juries, however, repeatedly has passed the constitutional test. *See Haas*, 450 A.2d at 1182–85; *Nance*, 161 A.2d at 799. On the other hand, the distinguishing characteristics of the special jury procedure are not constitutionally protected, and may be controlled by legislative action. *In re Asbestos Litigation*, Del.Super., 551 A.2d 1296 (1988).

**8.** This Judge has a vague remembrance of Rodney M. Layton and his then co-counsel, Judge Jane Richards Roth, asking for special juries in medical malpractice cases in the 1960s and 1970s. Medical malpractice cases were relatively few, but issues of qualifications of experts did arise. *See Peters v. Gelb*, Del.Super., 303 A.2d 685 (1973) (the file includes an application for a special jury). At that time, the Court was well versed in the procedure for selecting special juries. *See Robelen Piano Co. v. DiFonzo*, Del.Supr., 3 Storey 514, 172 A.2d 568 (1961).

Members of the Bench and Bar have, for some time, turned their focus to the more sophisticated use of specialized expert witness testimony in the type of cases where special juries and advisory experts may have been formerly used. An expert is a person specially qualified in a field of knowledge. William A. Stern, *Getting the Evidence*, 240 (1936). The term "expert," from experti, signifies instructed by experience. *Dole v. Johnson*, N.H.Supr., 50 N.H. 452 (1870)(discussing the meaning of "expert" in the 1870s). It appears that throughout the history of the American legal process, expert witnesses have played an important role. One early United States case dealing with expert testimony was decided in Pennsylvania in 1803. The entire opinion of the Pennsylvania Supreme Court in that case read:

> Mere abstract opinion is not evidence; but a surveyor, or any other person conversant in the subject, may state facts, and his opinion on those facts, to enable the jury to form a correct judgment of the matter in dispute. It is general information in a question of science, which others unacquainted with the subject must necessarily want. Thus a physician, who has not seen the particular patient, may, after hearing the evidence of others, be called to prove on his oath, the general effects of a particular disease, and its probable consequences.

*Forbes v. Caruthers*, Pa.Supr., 3 Yeates 527 (1803). This early decision followed the British trend, as set forth in the case of *Folkes v. Chadd*, 3 Dougl. 157, 158 (1782), where Lord Mansfield allowed the opinion of men of science to be given where an expert alone could have knowledge on a subject.

The trend of allowing experts to testify and give expert opinion testimony continued to develop. In New Hampshire, as early as 1826, it was recognized that, on questions of science or trade, persons of skill were allowed to speak not only to the facts, but were allowed to give their opinions in evidence. *Town of Rochester v. Town of Chester*, N.H.Super., 3 N.H. 349 (1826). In fact, the Supreme Court of the United States recognized in 1858 that the maxim of *"cuique in sua arte credendum"* [9] permits experts to be examined as to questions of art or science particular to their trade or profession. *Winans v. N.Y. & Erie R.R. Co.*, 62 U.S. 88, 101, 21 How. 88, 16 L.Ed. 68 (1858) (quoted in *Menefee v. U.S.*, 9th Cir., 236 F. 826, 835 (1916)).

Courts recognized early on that, to be qualified as an expert, an "expert must have made the subject upon which he gives his opinion a matter of particular study, practice, or observation, and he must have particular and special knowledge on the subject." *Jones v. Tucker*, N.H.Supr., 41 N.H. 546 (1860); *see Copenhaver v. Northern Pacific Railway* Co., Mt.Supr., 42 Mont. 453, 113 P. 467, 470 (1911); *Cummings v. Reins Copper Co.*, Mt.Supr., 40 Mont. 599, 107 P. 904, 911 (1910) (citing a Montana statute). In the early days of expert testimony, experts could only be implicitly received on points of really scientific character, and the persons offered must have been really men of science. *Dole v. Johnson*, N.H.Supr., 50 N.H. 452 (1870). Greenleaf described the capacity required for one to be considered an expert:

> Besides the fundamental or organic powers, mental and moral, requisite for all testimony, there is another sort of capacity, always requisite,—the power of

---

9. This maxim means anyone is entitled to credence pertaining to his own craft. Ballen-

tine's Law Dictionary, 295 (3d ed.1969).

acquiring fairly accurate knowledge so far as the element of skill enters into the acquisition of knowledge. Such skill or fitness to obtain correct impressions comes from circumstances which may roughly be summed up in the term "experience,"—a term of wide scope embracing the every day use of faculties, the habit and practice of an occupation, special study, professional training, etc., which may have contributed to form this sort of capacity.

1 Simon Greenleaf, *Law of Evidence,* 522 (16th ed. 1899) (hereinafter "Greenleaf on Evidence").

During this time, the rule determining the subjects upon which an expert could testify, and the rule prescribing the qualifications of experts were viewed as matters of law, while the determination of whether the expert possessed those qualifications was a question of fact, but one for the Trial Judge. *Jones,* 41 N.H. 546.

The use of expert testimony, however, was met with skepticism. Justice Pettit of the Indiana Supreme Court wrote in 1871: "We are not enamored with expert testimony, however procured or presented." *Rush v. Megee,* Ind.Supr., 36 Ind. 69 (1871). Similarly, the Supreme Court of Michigan stated just after the Civil War that expert testimony was not desirable in any case where the jury could get along without it, and expert testimony would only be admitted from necessity or where it would be of some value. *People v. Morrigan,* Mich.Supr., 29 Mich. 4 (1874).[10] One Court said that "evidence of experts is of the lowest order and of the most unsatisfactory character." *Whitaker v. Parker,* Iowa Supr., 42 Iowa 585 (1876) (disagreed with in modern times by *Nelson v. Nelson,* Iowa Supr., 249 Iowa 638, 87 N.W.2d 767 (1958)). Around the same time frame, the United States Supreme Court expressed

its skepticism concerning the use of expert testimony:

> Experience has shown that opposite opinions of persons professing to be experts may be obtained to any amount; and it often occurs that not only many days, but even weeks, are consumed in cross-examinations, to test the skill or knowledge of such witnesses and the correctness of their opinions, wasting the time and wearying the patience of both court and jury, and perplexing, instead of elucidating, the questions involved in the issue.

*Winans,* 62 U.S. at 101.

Scholars also had doubts about the widespread and unfettered use of expert testimony. Around the turn of the Twentieth Century, Professor Charles F. Himes, in the *Journal of the Franklin Institute,* Vol. 135, p. 409, stated:

> Perhaps the testimony which least deserves credit with a jury is that of the skilled witness. It is often surprising to see with what facility and to what an extent their views can be made to correspond with the wishes or the interests of the parties who call them. They do not, indeed, willfully misrepresent what they think, but their judgment becomes so warped by regarding the subject in one point of view that even when conscientiously disposed, they are incapable of expressing a candid opinion.... They are selected on account of their ability to express a favorable opinion, which, there is great reason to believe, is in many instances the result alone of employment and the bias growing out of it.

William Foster, *supra* p. 4 at 170–71 (quoting Professor Himes).

But, even with this skepticism, the Courts became more willing to accept the

---

10. *See also* 3 Burr W. Jones, *Commentaries on Evidence 2d* § 1371 (1926) (citing cases that spoke unfavorably as to the use of expert testimony).

use of expert testimony in matters. Learned Hand noted the expert would overtake the jury function only if the jury believes him. *Hand* at 52.[11] In fact, Courts began to accept the notion that "[t]he common mind, as we know it, is not always equal to the proper solution of such a problem ... and the counsel and advice of engineers or persons of experience in such matters is always valuable and desirable; and it is quite plain that the tendency of courts and writers on the law of evidence is in that direction." *Finn v. Cassidy*, N.Y.App., 165 N.Y. 584, 59 N.E. 311, 313 (1901). The *Finn* Court further noted that the expert's opinion is not decisive when expert opinions may be given on both sides of the issue. *Id.*

What first developed was a system where the expert was not allowed to draw inferences of fact from the evidence, but rather, the expert simply had to declare his opinion upon a known or hypothetical state of fact. *Rush v. Megee*, Ind.Supr., 36 Ind. 69, (1871). This followed the practice in England, where the expert was not allowed to give his opinion upon all of the evidence; but certain facts and particulars were stated to the expert and the expert was to say what the facts indicated if they were true. *Id.* But expert opinions on various topics became increasingly standard. *See Dougherty v. Milliken*, N.Y. Ct. of App., 163 N.Y. 527, 57 N.E. 757, 759 (1900) (opinion permitted in "cases in which the conclusions to be drawn from the facts stated, as well as knowledge of the facts themselves, depend upon profes-

sional or scientific knowledge or skill not within the range of ordinary training or intelligence. In such cases not only the facts, but the conclusions to which they lead, may be testified to by qualified experts") (the Court finding insufficient factual support for the expert opinions expressed); *Copenhaver*, 113 P. at 470; *see also Davis v. Maryland*, Md.App., 38 Md. 15 (1873) (allowing a doctor's opinion as to whether injuries were likely to have been occasioned by accidentally falling into a sink even though the doctor was not present during the whole cross-examination of the witnesses).

At least as early as 1854, medical experts were used in Delaware. Medical witnesses were allowed to give their opinions about a prisoner's state of mind at the time of the alleged crime. *See State v. Windsor*, Del. Ct. General Sessions, 5 Harr. 512 (1854). By 1862 it was "well settled" that testamentary witnesses, practitioners of the medical professions and experts were always allowed to testify as the testator's mental capacity and they did not have to state the "particular grounds on which they formed [their opinions]." *Lodge v. Lodge*, Del.Super., 2 Houst. 418, 421 (1862).[12] The use of medical experts to determine issues continued throughout the 1800s. *See Doe v. Killen*, Del.Super., 5 Houst. 14 (1875) (allowing expert medical testimony to determine whether a child was born alive); *State v. Reidell*, Ct. of Oyer and Terminer, 9 Houst. 470, 14 A. 550, 552 (1888). With time, Delaware Courts allowed expert testimony to be

---

11. Hand, in his 1901 article, argues for the institution of an advisory tribunal in certain cases. Hand argues that experts become the champion of one side and the jury, who has no experience in the matter must choose between the experts. *See Hand* at 52–53. Hand advocates that there be a board of experts, not called by either side, who should advise the jury of the general propositions applicable to the case that lie within the expert's province.

*Id.* at 56. He states that the only change from the existing system would be that the final statement of what was true would be from the expert advising the jury. *Id.* at 56.

12. One is tempted to draw too much from this comment, i.e., a Victorian deference to established hierarchy. But the effort was probably directed to distinguishing between the factual basis necessary for expert and law opinions.

used to prove matters beyond medicine. *See Rice v. Pennypacker,* Del. Ch., 5 Del. Ch. 33 (1875) (admitting expert testimony in the science of bookkeeping); *Maxwell v. Wilmington City Railway Co.,* Del. Super., 1 Marv. 199, 40 A. 945, 946 (1893) (allowing a locomotive engineer to give his opinion in a negligence case as to whether a train car could have stopped more quickly with the application of sand to the steel rails); *but see State v. Fleming,* Del. Ch., 3 Del.Ch. 517 (1867) (not allowing expert testimony on the issue of whether a trustee had acted with due diligence and fidelity because, as the Court noted: "[i]t is for the Court, not for the witnesses, to adjudge the question of neglect, bad faith or mismanagement)."

It became commonplace throughout the country for the Trial Judge to preliminarily determine if the expert was or was not qualified to testify. *Congress and Empire Spring Co. v. Edgar,* 99 U.S. 645, 658, 25 L.Ed. 487 (1878). If the expert was qualified, then it was up to the jury to determine what, if any, weight to be given to the testimony. *Id.* It was, and is, the duty of the Trial Judge to decide whether the skill of any person in the matter on which evidence of his opinion is offered is sufficient to entitle him to be considered an expert. William Reynolds, *Stephen on Evidence,* 78 (1879).

While the early law concerning experts was confused to a large extent by the diversity of practice and the exercise of judicial discretion (*see Dole,* 50 N.H. 452), the confusion was somewhat set to rest in the 1920s. The predominant test that emerged for the admissibility of expert opinion testimony was the so-called *Frye* "general acceptance" test. *See Frye v. U.S.,* D.C.App., 293 F. 1013 (1923). The *Frye* Court stated that, before admitting expert opinion, the scientific principle or discovery must be sufficiently established to have gained general acceptance in its particular field. *Id.* at 1014. For 70 years after its formulation, the "general acceptance" test was the dominant standard for determining novel scientific evidence at trial. *See Daubert,* 509 U.S. at 585, 113 S.Ct. 2786 (citing E. Green & C. Nelson, *Problems, Cases, and Materials on Evidence* 649 (1983)).

Although not specifically enunciated, it appears that Delaware followed the general trend for the admissibility of expert testimony until the adoption of the Federal Rules. The *Frye* approach was never fully accepted nor rejected by the Delaware Courts. *See* David L. Finger & Louis J. Finger, *Delaware Trial Handbook,* § 18:3 (1994). Delaware Courts after *Frye* determined that expert testimony is the evidence of persons who are skilled in some art, science, profession, or business; which skill or knowledge is not common to their fellow men and which has come to such experts by reason of special study and experience. *Culver v. Prudential Ins. Co. of America,* Del.Super., 6 W.W.Harr. 582, 179 A. 400, 403 (1935).[13] Because the general rule in Delaware was that opinions of witnesses were irrelevant, only out of necessity would the Courts of this State allow an expert to give an opinion. *South Atlantic S.S. Co. of Delaware v. Munkacsy,* Del.Supr., 7 W.W. Harr. 580, 187 A. 600, 604 (1936), *cert. denied,* 299 U.S. 607, 57 S.Ct. 233, 81 L.Ed. 448 (1936). "Upon matters which may be supposed to be outside the knowledge of persons of common education and experience, and with respect to which they are likely to be incapable of forming a correct judgment, witnesses shown to be learned, skilled or experienced in such matters" could, in a proper case,

**13.** This phraseology is still commonly used in jury charges when the trial Judge explains the concept of expert testimony.

give their opinion. *Id.* Judges had to preliminarily pass on a witness' qualification to speak to determine if the subject matter properly was within the field of expert testimony. *Scotton v. Wright,* Del. Ch., 122 A. 541, 545 (1923). The Trial Court's ruling would only be disturbed if it was manifestly erroneous. *Id.* (citing *Congress & Empire Spring Co.,* 99 U.S. at 645).

The adoption of the Federal Rules, however, cast some doubt throughout the country as to the applicability of the *Frye* test. *See* 4 Joseph M. McLaughlin, *Weinstein's Federal Evidence 2d.* § 702 App. 100.[14] Some Circuits held that the enactment of the Federal Rule preempted the *Frye* standard. *See Christophersen v. Allied–Signal Corp.,* 5th Cir., 939 F.2d 1106, 1115 (1991) (holding that the *Frye* test and the Federal Rules can co-exist); *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 3d Cir., 911 F.2d 941, 953 (1990) (illustrating a more "liberal criteria" to be used under the Federal Rules than the "general acceptance" test enunciated in *Frye* ); *United States v. Luschen,* 8th Cir., 614 F.2d 1164, 1169 (1980) (the Court should use a broader test than the "general acceptance" test in determining the admissibility of an expert). Other Courts, however, continued to use the *Frye* test to govern the admissibility of expert testimony, even after the enactment of the Federal Rules. *U.S. v. Shorter,* D.C.Cir., 809 F.2d 54, 59–60 (1987) (using the *Frye* test to determine the admissibility of expert evidence after the adoption of the Federal Rules); *Novak v. U.S.,* 6th Cir., 865 F.2d 718, 722 (1989) (testing the admissibility of expert testimony under Rule 702 with the "generally accepted" test); *U.S. v. Smith,* 7th Cir., 869 F.2d 348, 352–53 (1989) (using the *Frye* test to evaluate an expert witness after the adoption of the Federal Rules).

Delaware did not exclusively rely on the *Frye* general acceptance test after the adoption of the Federal Rules. *See Nelson v. State,* Del.Supr., 628 A.2d 69, 73 (1993); *Fensterer v. State,* Del.Supr., 493 A.2d 959, 962 n. 3 (1985), *rev'd on other grounds,* 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985); *Whalen v. State,* Del. Supr., 434 A.2d 1346, 1354 (1980), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). The Delaware Supreme Court standard for expert admissibility prior to *Daubert* was that an expert needed "only to show that any test used as a basis for his opinion [was] reasonably relied upon by experts in his field." *Santiago v. State,* Del.Supr., 510 A.2d 488, 489 (1986). Delaware thus adopted a point of view more open to expert opinion other than *Frye.* It did so by paraphrasing language from Delaware Rule of Evidence 703. *See* Footnote 14. The admissibility standards for expert testimony generally changed with the United States Supreme Court's ruling in the now landmark case of *Daubert,* decided a month before *Nelson.* The *Nelson* opinion demonstrates that Delaware anticipated *Daubert.*

In *Daubert,* the United States Supreme Court decided that the *Frye* test was superseded by the adoption of the Federal Rules. 509 U.S. at 587, 113 S.Ct. 2786. The Supreme Court dispensed with what it called a "rigid 'general acceptance' requirement" holding that the *Frye* test was

**14.** Rule 702 states: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." D.R.E 702. Rule 703 states: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." D.R.E. 703.

at odds with the "liberal thrust" of the Federal Rules. *Id.* at 588, 113 S.Ct. 2786. The Court noted that expert testimony must be "supported by appropriate validation—'good grounds' on what is known." [15] But there was a kicker to the expansive trend. The *Daubert* standard required that scientific expert testimony had to be not only relevant but also reliable. *Id.* at 590–93, 597, 113 S.Ct. 2786. The Court required a preliminary assessment by the Trial Court to determine whether the reasoning or methodology underlying the expert's testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts at issue. *Id.* at 593, 113 S.Ct. 2786. The Supreme Court opined that when the Trial Court was faced with a proffered expert, the Trial Judge, at the outset, had to make a determination pursuant to Rule 104(a) as to the admissibility of expert evidence. *Id.* at 592, 113 S.Ct. 2786. The Court set forth some non-exclusive factors that Courts could consider in making a determination as to whether an expert's testimony was relevant and reliable. They included: 1) whether the technique or scientific knowledge is capable of testing or has been tested (the testing requirement), 2) whether the theory or technique has been subjected to peer review and publication (the publication requirement), 3) the known or potential rate of error and the standards for controlling the technique's operation (the control requirement), and 4) whether the technique had gained "general acceptance." *Id.* at 593–594, 113 S.Ct. 2786. The Court warned that the Trial Court's inquiry was a flexible one and that the factors set forth within the Opinion were not to be considered a "definitive checklist or test." *Id.* at 593, 113 S.Ct. 2786.

*Daubert* is a two-sided coin. On the one side, it is expansive, rejecting the exclusivity of the "general acceptance" requirement; on the other side, it is restrictive, with a focus on the Trial Judge's responsibility as a gatekeeper on reliability. Relevance takes on an added qualitative dimension, one that involves the Trial Judge deeper into fact finding as to the threshold decision on the admission of evidence. Courts are not just to let the opinion of the credentialed expert into evidence for what it is worth and leave its evaluation to the jury. No longer was exclusion to be limited to the off-the-wall ramblings of itinerant medicine men who earn their living by testifying. *Daubert* is clearly a further effort, and a deeper one, to curb speculation by imposing legal guideposts in an attempt to require a reasonable quality of expert opinion under standards used in the expert community. But *Daubert* was also designed to escape the consensus threshold of *Frye* and give full range to respectable expert opinion.

The Supreme Court's decision in *Daubert*, however, did not settle the entire debate as to how expert testimony was to be handled. Footnote 8 of the *Daubert* Opinion states: "Our discussion is limited to the scientific context because that is the nature of the expertise offered here." *Id.* at 589 n. 8, 113 S.Ct. 2786. Lack of definitive guidance in *Daubert* left Judges with the task of deciphering *Daubert*'s impact on non-scientific testimony. Kimberly M. Hrabosky, Note, *Kumho Tire v. Carmi-*

---

**15.** It is interesting to note that D.R.E. 703, in talking about whether necessity of admissibility of the "facts or data ... upon which an expert bases an opinion," states such facts and data need not be admissible "[i]f a type reasonably relied upon by experts in the particular field ...." It would seem this codified standard would be sufficient, not only to negate the necessity of admissibility, but to give a standard for the degree of acceptance required. But we Judges seem to have a propensity for saying the same proposition in different ways to the confusion of everyone, even the lawyer reader.

*chael: Stretching Daubert Beyond Recognition,* 8 Geo. Mason L.Rev. 203, 207 (1999).

Logical arguments regarding *Daubert's* applicability to non-scientific expert testimony remained an open issue until the *Kumho Tire* decision. In the interim, there was a split between Federal Circuit Courts as to whether the *Daubert* decision applied to non-scientific experts (whatever that concept may include). Some Federal Circuits, including the Fifth and the Eighth Circuits, held that *Daubert* was applicable to the non-scientific expert testimony. *See Moore v. Ashland Chemical, Inc.,* 5th Cir., 151 F.3d 269, 275 n. 6 (1998) (holding that the general principles of Rule 702 recognized by the *Daubert* decision are applicable to other species of expert testimony); *Dancy v. Hyster Co.,* 8th Cir., 127 F.3d 649, 652 (1997) (expressly rejecting the idea that *Daubert* principles apply to only scientific principles or methods). Other Courts held that the *Daubert* factors were only applicable to testimony bearing on scientific knowledge. *McKendall v. Crown Control Corp.,* 9th Cir., 122 F.3d 803, 806 (1997); *Compton v. Subaru of America, Inc.,* 10th Cir., 82 F.3d 1513, 1518 (1996) ("The language in *Daubert* makes clear the factors outlined by the Court are applicable only when a proffered expert relies on some principle or methodology. In other words, application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely on experience or training"); *Iacobelli Const., Inc. v. County of Monroe,* 2d Cir., 32 F.3d 19, 25 (1994) (holding that *Daubert* sought only to clarify the standard for evaluating "scientific knowledge" under Rule 702).

The United States Supreme Court attempted to clarify the *Daubert* decision with its subsequent decision in *Kumho Tire.* The *Kumho Tire* decision explicitly stated that the "evidentiary rationale that underlay the Court's basic *Daubert* 'gatekeeping' determination [is not] limited to 'scientific' knowledge." *Kumho Tire Co.,* 119 S.Ct. at 1174. The Court determined that the Rules grant latitude for the Trial Court to evaluate all experts, not just scientific ones. *Id.* The Supreme Court reiterated that the Trial Judge must determine whether expert testimony has a "reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* at 1175. The Supreme Court explicitly stated that it is the job of the Trial Court to determine whether the evidence is reliable and whether the evidence has a valid connection to the pertinent inquiry as a precondition of admissibility. *Id.*[16] While the precise analysis is somewhat issue-dependent, this comprehensive approach certainly makes common sense and eliminates one area of definitional and classification nightmares.

■ In *Nelson,* 628 A.2d at 74, our Supreme Court adopted for the admission of expert testimony an application of the Delaware Rules of Evidence expert witness approach first articulated by Judge Gebelein in *State v. Pennell,* Del.Super., 584 A.2d 513, 515 (1989). As annotated by the Supreme Court, a Court needs to determine:

1. The expert witness is qualified (D.R.E.702);

2. The evidence is otherwise admissible, relevant, and reliable (D.R.E. 401 and 402);

3. The bases for the opinion are those reasonably relied upon by experts in the field (D.R.E.703);

4. The specialized knowledge being offered will assist the trier of fact to

---

16. The Court also clarified that the *Daubert* factors were meant to be helpful and not definitive. *Id.* at 1175. The Court emphasized that the application of the *Daubert* factors depends on the circumstances of the particular case. *Id.*

understand the evidence or determine a fact in issue (D.R.E. 702); and

5. The evidence does not create unfair prejudice, confuse the issues, or mislead the jury (D.R.E. 403).

Following the *Kumho Tire* decision, the Delaware Supreme Court has followed its trend and adopted as its own the United States Supreme Court precedent regarding the admissibility of expert testimony.[17] The trend began when, "[i]n *Nelson v. State*, the Delaware Supreme Court acknowledged *Daubert* and held that, in this State, the admissibility of scientific evidence is not governed by *Frye* but by the Delaware Rules of Evidence which generally track their federal counterparts." *State v. Steen*, Del.Super., 99A–04–016-NAB, 1999 WL 743326, Barron, J. (July 29, 1999) (citing *Nelson*, 628 A.2d at 74). Then, just last year, the Delaware Supreme Court affirmatively held that "[s]ince Delaware Rule of Evidence 702 is identical to its federal counterpart, we rely on the United States Supreme Court's most recent authoritative interpretation of Federal Rule of Evidence 702." *M.G. Bancorporation*, 737 A.2d at 521. The Delaware Court thus has expressly adopted the holdings of *Daubert* and *Kumho Tire* as the correct interpretation of Delaware Rule of Evidence 702.

■ Under *Daubert, Kumho Tire* and *M.G. Bancorporation*, the Trial Judge acts as the gatekeeper to ensure that the scientific testimony is not only relevant but reliable. *Id.* at 521; *Pfizer v. Advanced Monobloc Corp.*, Del.Super., 97C–04–037-

WTQ, Quillen, J. (Sept. 2, 1999). The Trial Judge must play an active role in ruling on the admissibility of evidence. Patrick C. Barry, Comment, *Admissibility of Scientific Evidence in the Remand of Daubert v. Merrell Dow Pharmaceuticals, Inc.: Questioning the Answers*, 2 Widener L. Symp. J. 299, 311 (1997). The polestar must always be scientific or other validity and the evidentiary relevance and reliability of the principles that underlie a proposed submission. *Kinnaman v. Ford Motor Co.*, D. Mo., No. 4:98CV269–SNL, Limbaugh, J. (Jan. 10, 2000) (quoting *Jaurequi v. Carter Mfg. Co. Inc.*, 8th Cir., 173 F.3d 1076, 1081 (1999)).[18]

■ As one would suspect, the proponent of the proffered expert testimony bears the burden of establishing the relevance, reliability, and admissibility by a preponderance of the evidence. *National Bank of Commerce v. Dow Chemical Co.*, D. Ark., 965 F.Supp. 1490, 1497 (1996), *aff'd*, 8th Cir., 133 F.3d 1132 (1998); *Schmaltz v. Norfolk & Western Railway Co.*, D. Ill., 878 F.Supp. 1119, 1120 (1995); *see also* Harvey Brown, *Procedural Issues Under Daubert*, 36 Houst. L.Rev. 1133, 1136 (1999) (citing cases).

■ Another source of confusion is the appropriate procedure. In *Daubert*, the Court opined that "[f]aced with a proffer of expert scientific testimony, then, the Trial Judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to: (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact at issue."[19] *Daubert*, 509 U.S. at 592, 113

---

17. It certainly helps respect for the law when identical or similar concepts are given the same interpretation by Federal and State Courts.

18. After clearing the evidentiary hurdle of Rule 702, parties still have to satisfy Rule 403's requirement that evidence must be

more probative than prejudicial. *Weinstein's Federal Evidence 2d* § 702.5[4].

19. Rule 104(a) provides: " 'Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions

S.Ct. 2786. And, with that statement, the so-called *Daubert* hearing was born.[20]

*Daubert* hearings were created for Courts to determine the soundness of an expert's opinions. A *Daubert* hearing was meant to be a manageable evidentiary hearing where the Trial Judge could outline and evaluate the qualifications of an expert prior to trial. Louis A. Jacobs, *Giving Lie to Antiquated Notions About Scientific Evidence*, 22 Am. J. Trial Advoc. 507, 537–38 (1999). These hearings were not required in every case and for every expert. *Id.* at 540. Some Courts, however, erroneously held that *Daubert* hearings were mandatory for all experts. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 9th Cir., 43 F.3d 1311, 1319 n. 10 (1995) (holding after remand that "[w]here the opposing party thus raises a material dispute as to the admissibility of expert scientific evidence, the district court must hold an in Limine hearing (a so-called *Daubert* hearing) to consider the conflicting evidence ..."); *Caubarreaux v. E.I. Dupont de Nemours*, La.App., 714 So.2d 67, 71 (1998) (holding that under *Daubert* and State law principles, the Trial Court is mandated to order a pretrial or status conference to discuss and simplify any *Daubert* issues, or, if those issues are still not resolved, to hold a pretrial *Daubert* hearing). The requirement of mandatory *Daubert* hearings appears to have been the minority view. *Kirstein v. Parks Corp.*, 7th Cir., 159 F.3d 1065, 1067 (1998) ("We have not required that the *Daubert* inquiry take any specific form and have, in fact,

upheld a judge's *sua sponte* consideration of the admissibility of expert testimony"); *Target Market Publishing, Inc. v. ADVO, Inc.*, 7th Cir., 136 F.3d 1139, 1142 n. 9 (1998) (holding that the Supreme Court does not require an evidentiary hearing in every case); *City of Tuscaloosa v. Harcros Chemicals Inc.*, 11th Cir., 158 F.3d 548, 565 n. 21 (1998) ("*Daubert* hearings are not required by law or rules of procedure..."); *U.S. v. Call*, 10th Cir., 129 F.3d 1402, 1405 (1997) (opining that *Daubert* hearings are not required). Thus, prior to *Kumho Tire*, a Trial Judge was not required to hold a hearing on the admissibility of expert evidence; the Judge could decide without a hearing if the parties have given a sufficient evidentiary basis for the decision. *Weinstein's Federal Evidence 2d* § 702.2[2].

■ To the extent the question of whether a *Daubert* hearing was required in all cases remained open, the *Kumho Tire* decision wisely cleared the air when it held that a Court does not need to hold a full evidentiary hearing each time a party offers expert witness testimony. *In re Syed*, D. Ill., 238 B.R. 133, 142 (1999), *see generally* Harvey Brown, *Procedural Issues Under Daubert*, 36 Houst. L.Rev. 1133, 1149 (1999). The Trial Court should have the same kind of latitude in deciding *how* to test an expert's reliability, and deciding whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testi-

of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges.' These matters should be established by a preponderance of proof. *See Bourjaily v. United States*, 483 U.S. 171, 175–176, 107 S.Ct. 2775, 2778–2779, 97 L.Ed.2d 144 (1987)." *Daubert*, 509 U.S. at 592 n. 10, 113 S.Ct. 2786; Del. R. Evid. 104(a).

**20.** Evidentiary hearings to determine the admissibility of evidence were also performed under the *Frye* standard. *See U.S. v. Bonds*, 6th Cir., 12 F.3d 540 (1993). It never ceases to amaze this Judge how authors of procedural intricacies seem to assume that the case at hand is the only one on the docket and time is an endless commodity rather than a precious one.

mony is reliable. *Tanner v. Westbrook*, 5th Cir., 174 F.3d 542, 546 (1999) (quoting in part *Kumho Tire*, 119 S.Ct. at 1176). The latitude provided by *Kumho Tire* allows the Court to decide "what proceedings, if any, are needed to investigate reliability." *Weinstein's Federal Evidence 2d* § 702.5[2][a]; *U.S. v. Nichols*, 10th Cir., 169 F.3d 1255, 1262–64 (1999) (reviewing the denial of a *Daubert* hearing with abuse of discretion standard).

Although *Daubert* hearings are intended to be quite brief, they can become lengthy. *See* Jacobs, *supra*, p. 17 at 538 n. 137–138.[21] In fact, just last year, the Fifth Circuit stated:

> We would be remiss if we did not note that we are troubled by the amount of judicial resources that were devoted to the *Daubert* hearing. In a case capable of being tried start to finish in a day and one half, not only the court but the lawyers were engaged for the better part of five days in a hearing to determine the reliability of testimony and potential prejudice of exhibits involving a well known test that is applied in a straight forward manner.

*U.S. v. Katz*, 5th Cir., 178 F.3d 368, 371 (1999).[22]

The case currently before the Court is a prime example of how *Daubert* hearings could overwhelm. There are over 500 docket entries, and there are literally boxes of reports, depositions, and affidavits submitted in support of the parties' respective Motions to exclude experts. Recently, Plaintiffs' counsel has requested that the trial date be stayed so that the parties can have *Daubert* hearings in the time that is reserved for the trial (for a period of three weeks).[23] Such a request and similar requests, if granted in every case, could cripple the trial calender. While the matter is always discretionary, absent a special reason and need to have the hearings, requests for them should generally be denied. The discovery record should, in a contested case, normally supply a satisfactory basis for a ruling.

A pretrial procedure of some sort is, however, required. The Judge must gather the necessary information and evaluate the reliability of the underlying principles, the methodology employed by the expert witness,[24] and the potential relevance of the proposed evidence. *Standards and Procedures for Determining the Admissibility of Expert Evidence after Daubert*, 157 F.R.D. 571, 580 (1994). The

---

**21.** Professor Jacobs states in footnote 138 that Judges, law clerks, and staff often appreciate the break from mundane matters provided by the novelty of *Daubert*. With the heavy caseload of this Court, the lengthy and timeconsuming process of a *Daubert* hearing cannot become standard fare. If it does, surely the novelty of the *Daubert* hearings would wear off in a hurry.

**22.** This Judge has recently commented: "I can think of nothing more disastrous to civil case processing in this Court than this Court's routinely undertaking expensive pretrial testimonial *Daubert* hearings in the typical personal injury case. Until one of the deities in our hierarchy speaks, this trial Judge, with a civil calender of well over 500 cases as half of his work, will resist such a burdensome undertaking and make the pretrial decision on

the basis of deposition ...." *Ward v. Shoney's Inc.*, Del.Super., C.A. No. 98C–09–032, 2000 WL 303311, Quillen, J. (Feb. 24, 2000).

**23.** In a letter to the Court, dated February 17, 2000, Plaintiffs' counsel notes that he "has only been involved in one case where there have been extensive 403 hearings. In that instance, there were only four witnesses who were being challenged and the hearings lasted over four days."

**24.** "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

Court, in the normal course, should be supplied with the expert's report and the expert's deposition testimony, as well as any supporting affidavits, prior to making any determination as to whether a *Daubert* hearing is necessary. At that point, the Court should decide: 1) if a *Daubert* hearing should be held, and 2) on what issues. If, for special reasons, a *Daubert* hearing is deemed necessary, the Court should try to narrow the issues prior to the evidentiary hearing. If allowed, the hearings should be brief and targeted to the specific questions of the Court. The Court, however, should normally be able to rule, as a matter of law, on the papers, as to whether a hearing should be allowed and whether an expert or set of experts is qualified to speak on a particular subject.

In this case, there are no special circumstances. The parties have done an excellent job of providing the Court with a sufficient evidentiary basis to perform its "gatekeeping" function.[25] While there will undoubtedly be fine tuning prior to trial, this record provides a sufficient evidentiary basis to make a pretrial decision on the reliability, methodology, and relevance of the experts from the information provided. *Weinstein's Federal Evidence 2d* § 702.2[2]. Therefore, any request for pretrial *Daubert* evidentiary hearings is DENIED.

■■■■ Ultimately, the testimony of an expert is admitted upon the theory that, in a particular case, the issue is such that the jurors are not competent to draw their own conclusions from the facts without the aid of the expert. Benjamin Werne, *Rogers on Expert Testimony*, vii (3d ed.1941). The theory of expert testimony, as described in 1899, is equally applicable today. "[E]xpert capacity is a matter wholly relative to the subject of the particular question; that therefore the existence of the capacity arises in theory as a new inquiry from question to question; and that a particular person is not to be thought of as objectively or absolutely an expert in the sense that he is absolutely a German ... or six feet high." 1 Greenleaf on Evidence 523 (16th ed. 1899). The legal apparatus of our free and increasingly democratic society has wrestled with the problem of dealing with complex issues, issues calling for special skill and knowledge not common to the average man or woman. For the moment, with our jury trial history, we have focused on getting our help from the witness box in the form of the expert witness. But our skepticism of such compensated advocacy is high and we no longer rest on the mere proper credentials of the expert witnesses or even on being satisfied as to the general relevancy of the expert's opinion. We now require the Trial Judge, notwithstanding his or her laity, to test the reliability of the expert's opinion. The basis of the opinion must have "good grounds" when judged by experts in the same general field as the witness. The Trial Judge must determine whether the reasoning and methodology is valid by the professional standards of the scientific, professional, or business field of the expert. And the Trial Judge must determine whether the expert's reasoning or methodology can be applied to the facts at issue. The burden is a heavy one and one that will tax even the best Trial Judges, a hearty breed who pride themselves as decision-making pragmatists in the field of battle. But there can be no question that the burden has been imposed.

---

25. There is a problem of emphasis in cases of multiple attack. The advocates naturally tend to focus the debate on the subjects where exclusion of the evidence is the most likely. This focus leaves the record more bare in areas where scientific opinion is more established and the Court is more inclined to permit the evidence.

## DECISION

To meet the inquiry required by *Daubert, Kumho Tire* and *M.G. Bancorporation,* the Court in this case must closely examine whether or not there is a sufficient methodological foundation for the experts to give their opinion to the jury. Taking the five steps listed in *Nelson,* there does not seem to be any issue of the experts' general, or even specific, qualifications; specialized knowledge is demanded by the facts of the case; there is no unfair prejudice created by the use of expert testimony; and the evidence is relevant at least in a general sense.[26] The questions focus on the reliability of the evidence and the bases for the opinions being offered. Evaluating the expert opinion in this case is a difficult task because there is a great deal of debate as to whether certain of the Plaintiffs' alleged diseases are medically viable diagnoses and whether the building in fact caused their illnesses.

It appears that the best approach to take in this instance is to evaluate the Plaintiffs' experts first to determine whether their opinions are based on "good grounds" on what is known. The expert testimony sought to be excluded by Defendants is the testimony of several medical professionals who have either diagnosed the Plaintiffs with certain illnesses or have opined that certain unspecified agents in the Discover Card building have caused the Plaintiffs' illnesses. Defendants contend that the expert doctors employed by the Plaintiffs who have diagnosed the Plaintiffs with Multiple Chemical Sensitivity ("MCS") and Sick Building Syndrome ("SBS") should not be allowed to be heard by the jury because these diagnoses are not validly diagnosable conditions. Defendants further contend that any diagnosis of Fibromyalgia ("FM") and Chronic Fatigue Syndrome ("CFS") cannot be related to the conditions at the Discover Card building because there are no known causes for the illnesses. Finally, as to the remainder of the multitude of alleged illnesses of the Plaintiffs, Defendants claim that there is no specified causal agent that links any of the Plaintiffs' illnesses to the conditions at their workplace.[27]

It seems to the Court that the analytical approach of the Defendants is a good one. It also seems to the Court that the issues being raised by Defendants' three-pointed attack are different on a spectrum of pure medicine (science-like) to a mixed question of medicine and law (non-science-like). Whether a diagnosis is directed to a validly diagnosable condition is almost necessarily a consensus type question where, even under the non-exclusive factors suggested in *Daubert,* some tribute should be paid to "general acceptance." *Daubert* at 593–94, 113 S.Ct. 2786. When one moves along the spectrum to cause, there should be more leeway for individual opinion of a qualified expert. But where there is a general concession of no known cause, opinion drifts into the realm of speculation. To the contrary, where known causes exist, and the opinion is voiced that a similar factor present in a given case probably caused the illness, one must at least be tempted to let the injured party have his or her day in Court.

---

26. "Relevant evidence" itself, of course, has a reliability factor, "evidence having *any* tendency to make the existence of [a] fact ... more probably or less probable ...." D.R.E. 401 (emphasis added). But reliability in a *Daubert* sense is qualitatively different.

27. This Court held oral argument on the Motions in Limine and specifically asked counsel for both sides to discuss whether the diseases were medically valid diagnoses. The Court asked the parties if there were any known causes for these diseases. The Court also asked the parties to discuss whether there was any specific agent in the Discover Card building that could have caused these diseases.

■ As a threshold matter, *Daubert* neither requires nor empowers Trial Courts to determine which of several competing scientific theories has the best performance. *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 1st Cir., 161 F.3d 77, 85 (1998). *Daubert* demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a sound and methodologically reliable manner. *Id.* (citing *Kannankeril v. Terminix International, Inc.*, 3d Cir., 128 F.3d 802, 806 (1997); *In re Paoli R.R. Yard PCB Litigation*, 3d Cir., 35 F.3d 717, 744 (1994)). There are, however, differences between truth seeking in the courtroom and in the laboratory. *Moore v. Ashland Chemical Inc.*, 5th Cir., 151 F.3d 269, 275 (1998).

It is true that open debate is an essential part of both legal and scientific analyses. Yet there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence— about a particular set of events in the past. . . . [A] gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

*Daubert,* 509 U.S. at 596–97, 113 S.Ct. 2786.

This is one of those cases where it is possible that the precepts of science have not caught up with all of the claims of the Plaintiffs. But the Court must evaluate those claims in a snapshot in time and finally decide the dispute. The most expeditious way to evaluate the relevance and reliability of the Plaintiffs' experts is to first evaluate the testimony of Dr. Grace Ziem. Dr. Ziem seems to be the most controversial of the experts presented and her expert testimony and reports were relied upon by several of the other experts at issue in this case.

## I. DEFENDANTS' MOTIONS TO EXCLUDE EXPERTS

### A. Dr. Grace Ziem

Dr. Grace Ziem is a physician, employed by the Plaintiffs, purportedly as a treating physician and expert witness in this case. Dr. Ziem received her medical degree from the University of Kansas, and has continued her education by receiving a Masters of Public Health from Johns Hopkins University, a Master of Science in Hygiene from the Harvard School of Public Health, and a Ph.D. from the Harvard School of Public Health. Curriculum Vitae of Grace Ziem, M.D. Dr.P.H., Dkt. No. 526, Ex. 1. In this instance, it appears that there are no real questions as to Dr. Ziem's qualifications to testify as an expert. Rather, this Judge must determine whether the evidence Dr. Ziem presents is genuinely scientific, as distinct from being unscientific speculation from a genuine scientist. *Rosen v. Ciba–Geigy Corp.*, 7th Cir., 78 F.3d 316, 318 (1996), *cert. denied,* 519 U.S. 819, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996).

In short, the Defendants dispute two main points relating to Dr. Ziem's testimo-

ny. The Defendants argue first that Dr. Ziem's diagnoses of Brennan, Muttart, and Minner lack a sufficient methodological foundation to allow her expert testimony to be given to the jury. Second, the Defendants argue that, because of her limited knowledge and limited visitation with each of the Plaintiffs, Dr. Ziem's testimony cannot be offered as a treating physician.

Dr. Ziem issued a combined report concerning Brennan, Muttart, and Minner. Dr. Ziem opined that these three of her patients have chronic illnesses involving various similar symptoms. Ziem Report Dated May 25, 1998, Dkt. No. 455, Ex. 3. Dr. Ziem diagnosed all three patients with Multiple Chemical Sensitivity ("MCS"), Sick Building Syndrome ("SBS"), Chronic Fatigue Syndrome ("CFS"), Fibromyalgia ("FM"), Reactive Airways Dysfunction Syndrome ("RADS"), and Toxic Encephalopathy ("TE"). *Id.* Dr. Ziem concluded her report by stating:

> These patients were chronically exposed to off gassing from frequent renovations in a tight building with documented inadequate air quality, they all were exposed to a building with a chronic moisture problem which leads to mold contamination and the release of mold-generated toxins into the working environment, they all were exposed chronically and frequently to construction dust over a long period of time. Volatile chemical compounds can and do adhere onto dust particles (thus carrying them deep into the lungs). In addition, cleaning chemicals were apparently used in the heating and ventilation system as a treatment for mold contamination and these could also have been a contributing factor to the illness.

*Id.*

The Court will evaluate Dr. Ziem's individual diagnoses in turn and attempt at the same time to evaluate the scientific validity of her diagnoses and determine whether there are any flaws in her causation analysis.

### 1. Multiple Chemical Sensitivity [28]

Dr. Ziem has diagnosed the Plaintiffs with MCS. Dr. Ziem's testimony concerning MCS must be excluded from the jury as unreliable on two fronts under the *Daubert* standard. First, the Court is satisfied that MCS is not a scientifically valid diagnosis. Second, the Court opines that Dr. Ziem's testimony that the Discover Card building somehow caused Plaintiffs' MCS seems to be based on nothing other than speculation.

There is no standard definition of MCS. A. Slotkoff, D. Radulovic & D. Clauw, *The Relationship Between Fibromyalgia and the Multiple Chemical Sensitivity Syndrome*, Scand J. Rheumatol 1997; 26:364–7, Dkt. No. 526, Ex. 18; *see also* Buchwald & Garrity, *Comparison of Patients with Chronic Fatigue Syndrome, Fibromyalgia, and Multiple Chemical Sensitivities*, Arch Intern. Med/Vol 154, at 2050 (Sept. 26, 1994). Although attempts have been made to establish diagnostic criteria, no strict definition of MCS has ever been obtained and no consistent pattern of immunological dysfunction has developed. A. Slotkoff, D. Radulovic & D. Clauw, at 366. One of the sources provided by the Plaintiffs offers what might be the general attitude concerning MCS.

> The origins of MCS are unknown but highly controversial in the medical community. Physicians at one extreme consider the syndrome to be pathophysiologically induced. Physicians at the other extreme argue that the chemical sensitivity in MCS syndrome is imaginary attributable to the patient's misrepresentation, or the physician's mis-

---

28. Dr. Ziem is the only expert doctor to diagnose the Plaintiffs with MCS.

diagnosis, of a traditional psychiatric disorder, (e.g., major depressive, phobic, generalized anxiety, or somatoform disorders). Yet, other physicians take an intermediate stance on the origins of MCS syndrome, one that implicates both personality and environment as etiological factors

A. Davidoff & L. Fogarty, *Psychogenic Origins of Multiple Sensitivities Syndrome: A Critical Review of the Research Literature*, 49 Archives of Environmental Health, 316, 317 (No. 5) (Sept./Oct.1994), Dkt. No. 504.

Mainstream medicine has neither properly defined nor widely accepted MCS as an organic entity. Ronald E. Gotts and Tamar D. Hamosh, *Multiple Chemical Sensitivities: A Symposium on the State of the Science*, 18 Regulatory Toxicology and Pharmacology, 61, 62 (1993), Dkt. No. 461, Ex. G. To this point, most Courts have not recognized the diagnosis of MCS as a scientifically valid diagnosis. *Coffey v. County of Hennepin*, D. Minn., 23 F.Supp.2d 1081, 1086 (1998) (citing *Brown v. Shalala*, 8th Cir., 15 F.3d 97, 100 (1994); *Summers v. Missouri Pacific R.R. System*, 10th Cir., 132 F.3d 599, 603 (1997); *Bradley v. Brown*, 7th Cir., 42 F.3d 434 (1994); *Coffin v. Orkin Exterminating Co. Inc.*, D.Me., 20 F.Supp.2d 107 (1998); *Frank v. State of New York*, D.N.Y., 972 F.Supp. 130, 136–37 (1997); *Sanderson v. International Flavors & Fragrances, Inc.*, D.Cal., 950 F.Supp. 981, 1002 (1996)), *see also, Carlin v. RFE Indus., Inc.*, D.N.Y., No. 88–CV–842, 1995 WL 760739, at *4, Scanlon, J. (Nov. 27, 1995); *Treadwell v. Dow–United Technologies*, D. Ala., 970 F.Supp. 974, 982 (1997); *Collins v. Welch*, N.Y.Supr., 178 Misc.2d 107, 678 N.Y.S.2d 444 (1998); *but see, Creamer v. Callahan*, D. Mass., 981 F.Supp. 703, 705 (1997) (remanding case to ALJ because the Social Security Administration recognizes MCS as a medically determinable impairment).

This Court is inclined to follow the general consensus. The sources provided by the Plaintiffs simply have not convinced this Court that MCS as a disease has reached the threshold of reliability needed to survive a *Daubert* inquiry. Such a diagnosis from a medical standpoint does not appear to have sufficient support from the literature to be credible.

But even if MCS would be considered a valid medical diagnosis, as the Social Security recognition might suggest, there is another significant flaw in Dr. Ziem's testimony. That is, she cannot identify a known cause of MCS. This appears to be the problem with MCS; people who make the diagnosis make unsupported judgments about *causation. Conclusions and Recommendations on Multiple Chemical Sensitivities (MCS)*, 24 Regulatory Toxicology and Pharmacology S–188 (1996). A lack of causal connection is borne out by Dr. Ziem's own testimony. Dr. Ziem opines that there were myotoxins in the air that caused the onset of MCS. At her December 11, 1998 deposition, Dr. Ziem was not aware of any published literature supporting a theory that mycotoxin exposure could cause Multiple Chemical Sensitivity. Ziem Dep. at 603, Dkt. No. 464.[29] In fact, she had not even done a search for that information. *Id.*[30] Additionally, Dr.

---

**29.** The Court does not mean to imply that there have to be published studies available for an expert to give his or her scientific opinion on a matter but it is one factor in determining whether an expert's opinion is based on good grounds. *Heller v. Shaw Industries, Inc.*, 3d Cir., 167 F.3d 146, 154 (1999); *Kannankeril*, 128 F.3d at 809.

**30.** This has been the fatal flaw in Dr. Ziem's testimony in front of other Courts. In *Chanin v. Eastern Virginia Medical School*, Va.App., 20 Va.App. 587, 459 S.E.2d 523, 524 (1995), the Virginia Court of Appeals opined that Dr. Ziem failed to identify any substances in the DePaul University environment that could have caused Dr. Chanin's MCS.

Ziem has failed in substance to provide this Court with a scientific or diagnostic method that supports her theory that myotoxins in the air caused the Plaintiffs' MCS. Causation of injury must be supported by more than the word of Dr. Ziem.[31] An opinion cannot be based simply on the *ipse dixit* of the expert. *General Electric Co.*, 522 U.S. at 146, 118 S.Ct. 512. Here, there is no cognizable link between the chemicals or toxins to which Plaintiffs may have been exposed and the purported MCS they allegedly contracted. *See Knapp v. Vestal Central School District*, N.Y.Supr., 247 A.D.2d 667, 668 N.Y.S.2d 718, 720 (1998). The Plaintiffs have not met their burden of establishing the admissibility of Dr. Ziem's diagnosis of MCS by a preponderance of proof.

### 2. *Sick Building Syndrome*

■ Dr. Ziem has also opined that the Plaintiffs suffer from SBS. While the Court is confident that there are circumstances where building-related illness can be diagnosed from an exposure to specific chemicals, the Court is also equally convinced that a general diagnosis of SBS is not yet a medically valid diagnosis.

SBS research has been concentrated on the search for causal relationships between possible factors in the air in the ventilation in buildings and the development of health effects pertaining thereto. Ake Thorn, *Case Report on a Sick Building: Analysis and Interpretation in the Context of its Disease History*, 22 Scand. J. Soc. Med. 228, 231 (1994).[32] The Defendants in this case attack the diagnosis of SBS by illustrating that there is no generally accepted

diagnostic criteria for it nor is there a generally accepted definition of the syndrome. "There is no universally accepted clinical definition of SBS and no adequate theory for its occurrence. The characteristics of SBS are non-specific symptoms that occur in a particular building, and are not caused by a specific illness such as hypersensitivity pneumonitis or infection." Carrie A. Redlich, Judy Sparer & Mark Cullen, *Sick-building Syndrome*, 349 The Lancet 1013 (April 5, 1997), Dkt. No. 504; *see also*, Mark J. Mendell & Allan H. Smith, *Consistent Pattern of Elevated Symptoms in Air–Conditioned Office Buildings: A Reanalysis of Epidemiologic Studies*, 80 American J. of Public Health 1193 (Oct.1990), Dkt. No. 504 (" 'Sick Building Syndrome'...has been recognized for over 15 years. Although particular chemical, biological, physical, or psychological factors have been implicated in some episodes, specific causes generally have not been identified)." Additionally, in a recent article in the New England Journal of Medicine, researchers noted that there is little convincing, direct evidence to implicate specific causative agents for building-related illnesses. Dick Menzies & Jean Bourbeau, *Building Related Illnesses*, The New England Journal of Medicine, Nov. 20, 1997. One author has written:

> In the previous decade there has been increasing debate about the symptom complex of "Sick Building · Syndrome." The growing dissatisfaction with the term originates from the total absence of consistent case definition of the "syn-

**31.** In keeping with the historical theme, the requirement of causation was a well-recognized essential element of the Plaintiff's case in chief in Seventeenth Century trespass actions. *Zuchowicz v. U.S.*, 2d Cir.; 140 F.3d 381, 384 n. 2 (citing *Weaver v. Ward*, Hobart 134, 80 Eng. Rep. 28 (K.B.1617) and *Gibbons v. Pepper*, 1 Ray. 38, 91 Eng. Rep. 922 (K.B.

1695)). "It is this question that we must seek to answer today in the context of modern medicine." *Id.* at 384.

**32.** Plaintiffs agree that SBS may not be a specific medical diagnosis, but argue that it is a separate physical condition related to the building. Plaintiffs' Ans. Br. at 68.

drome," the lack of biological markers for most symptoms, or even groups of symptoms, and failure to find consistent associations between "Sick Building Syndrome" and any building contaminant(s) across a large number of buildings studied. It has been argued that utilization of this term has not improved our understanding of the occurrence of these symptoms, and further, that to label an entire building as "sick" or "healthy" has no scientific foundation. E.J Bardana, Jr., *Sick Building Syndrome–A Wolf in Sheep's Clothing*, 79 Annals of Allergy, Asthma & Immunology, 283 (1997).[33]

In the Journal of the American Medical Association, in a Council Report on Clinical Ecology in 1992, the Council on Scientific Affairs stated:

> In contrast to building related illness, no specific causative agent has been identified for the symptoms occurring in patients with the Sick Building Syndrome.... The lack of agreement by workers in this field over the definition of the Sick Building Syndrome and inclusion and exclusion criteria for patients suspected of having this syndrome has hampered efforts to design well-controlled studies. Evidence that this syndrome exists as a separate disease entity is weak. Some have claimed that mass hysteria and other psychological factors are responsible for symptoms.

268 JAMA, Dec. 23/30, Clinical Ecology–Council on Scientific Affairs 3455, 3466 (1992). The Plaintiffs have provided sources that give conclusory opinions about SBS, but the sources provided do not give the Court sound diagnostic criteria to evaluate the claims of illness due to SBS. The literature in totality indicates that the medical community has not accepted as valid a diagnosis of SBS. Therefore, Dr. Ziem's diagnosis of SBS lacks the pertinent characteristics in sound scientific methodology to be put before the jury. Simply, there is not a sound scientific basis for Dr. Ziem's diagnosis of SBS and this Court is forced to exercise his gatekeeping function and exclude this diagnosis. Plaintiffs have not demonstrated by a preponderance of proof that a diagnosis of SBS is valid.

### 3. Chronic Fatigue Syndrome [34]

■ Defendants also seek to exclude Dr. Ziem's testimony as to her opinion that the Discover Card building caused CFS in the Plaintiffs. There is not a dispute between the parties that CFS is a scientifically valid diagnosis. The Court's ultimate conclusion on this issue, however, is that Dr. Ziem's opinion that the Plaintiffs' CFS was caused by the Discover Card building does not have a valid scientific foundation.

Normally, CFS can be diagnosed when a patient has had six or more consecutive months of severe fatigue, reported to be unrelieved by sufficient bed rest and accompanied by non-specific symptoms, including flu-like symptoms, generalized pain, and memory problems. *Diagnosis of Chronic Fatigue Syndrome*, http://www.cdc.gov.ncidod/diseases/cfs/cfs_info4.htm 12/22/99, Dkt. No. 528, Ex. 80. CFS is defined by the U.S. Center for Disease Control for research purposes as:

> persistent or relapsing fatigue lasting greater than 6 months that is unexplained by any other physical disorder.... Numerous biochemical abnor-

---

**33.** Bardana argues that SBS is a pseudodiagnosis composed of nonspecific, transient symptoms without known biological markers. *Id.*

**34.** Doctors Ziem, Howarth, Kaye, and Messinger all opine that the building has caused CFS and FM.

malities have been identified in CFS patients but none as yet are considered diagnostic. Many treatments are available, mostly for specific symptoms or deficiencies, but outcomes may vary and there is no know cure.

Albert Donnay, *Overlapping Disorders: Chronic Fatigue Syndrome, Fibromyalgia, Multiple Chemical Sensitivity & Gulf War Syndrome*, http://www.mcsrr.org/factsheets/overlapping.-html, visited 1/08/00, Dkt. No. 526, Ex 18. "Chronic fatigue syndrome, FM and MCS are clinical syndromes that are poorly understood in terms of cause, pathopsychology, natural history, and appropriate medical management." Buchwald & Garrity, *Comparison of Patients with Chronic Fatigue Syndrome, Fibromyalgia, and Multiple Chemical Sensitivities*, Arch Intern. Med/Vol 154, at 2050 (Sept. 26, 1994), Dkt. No. 526, Ex. 18.[35] Several authorities support the conclusion that the cause or causes of CFS are not known. *The Management of Chronic Fatigue Syndrome: A Statement for the Advisory Board of the American Association for Chronic Fatigue Syndrome (AACFS)*, http://www.aacfs.org/html/managment.htm, 12/14/99, Dkt. No. 460, *see also, Olson v. Apfel*, D. Ill., 17 F.Supp.2d 783, 790 (1998) (quoting the commissioner's policy statement); *Mitchell v. Eastman Kodak Co.*, 3d Cir., 113 F.3d 433, 443 (1997) ("the disease . . . has no known etiology.")[36]

■ Plaintiffs argue that:

Dr. Ziem also comes to her causation opinion based upon the symptoms of others at the building, . . . the temporality of the development of the three illnesses in all three plaintiffs, the plaintiffs' medical records and her exams . . . . Plaintiffs' low-level exposures were not for a matter of days, rather each of the plaintiffs herein allege that their exposure was no less than two years, i.e. Ms. Minner feels that her adverse exposure starting in 1991–1994 and Mr. Muttart and Mrs. Brennan never left employment of the building between 1988 and 1995, a total of eight years of exposure. This exposure was a cause of their development of Fibromyalgia and Chronic Fatigue Syndrome between 1993 and 1995. Therefore, plaintiffs urge, that *although specific toxins cannot be noted,* the long-term exposure at a building know to have a contaminated HVAC system and inadequate IAQ supports the causation analysis. In addition, the plaintiffs did not have these illnesses prior to working at the building. The chronic fatigue syndrome and Fibromyalgia became diagnosable only during their employment. This is sufficient under the authorities cited for Dr. Ziem's opinions that the building was a causal factor in the development of these illnesses to be admitted as reliable and fitting the facts

Plaintiffs' Ans. Br., Dkt. No. 500, 86–87 (emphasis supplied). Depending on the circumstances, a temporal relationship between exposure to a substance and the onset of a disease can provide compelling evidence of causation. *Westberry v. Gislaved Gummi AB*, 4th Cir., 178 F.3d 257, 265 (1999). Such a temporal relationship, however, will often be only one factor for the overall determination of whether an

**35.** Dr. Ziem herself has contributed to an article regarding the overlap of CFS, FM, and MCS. *See* Albert Donnay & Grace Ziem, *Prevalence and Overlap of Chronic Fatigue Syndrome and Fibromyalgia Syndrome Among 100 New Patients with Multiple Chemical Sensitivity Syndrome*, Epidemiology, 72 (1999).

**36.** Dr. Ziem states that the Center for Disease Control has not mentioned volatile organic chemicals as a proven cause for Chronic Fatigue Syndrome but insists that the CDC has not ruled out what she is saying. Ziem Dep. at 733, Dkt. No. 464.

expert has "good grounds" for his or her conclusion. *Heller*, 167 F.3d at 154. How much weight it provides for the overall determination of whether the expert has "good grounds" will differ depending on the strength of the temporal relationship. *Id.* There may be instances where a temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology. *Cavallo v. Star Enterprise*, D.Va., 892 F.Supp. 756, 774 (1995), *aff'd in pertinant part*, 4th Cir., 100 F.3d 1150 (1996).

While the Court can in a given situation accept a temporal association, in this instance, Dr. Ziem's report lacks the necessary scientific and intellectual rigor to give an opinion that the Plaintiffs' CFS was caused by this building. Dr. Ziem summarizes that "there is no evidence that any of these patients had disabling illnesses prior to their work at the Discover Card Building. None of them had frequent of disabling respiratory symptoms, none of them had body aching on a chronic basis, [and] none of them had chronic fatigue." Ziem, May 25, 1998 Report, Dkt. No. 455. She appears to solely relate the Plaintiffs' problems to dust, mold, moisture, and volatile organic compounds in the building without sufficiently excluding other possible causes. Dr. Ziem cannot identify a causative agent that triggered the syndrome. Additionally, Dr. Ziem does not adequately explain if Mr. Muttart's or Ms. Minner's smoking had any effect on their conditions. Nor does Dr. Ziem exclude other documented physical illnesses as a possible causal factor in all three Plaintiffs' syndromes. Other causative factors, in-

cluding, but not limited to, obesity, smoking, depression, medications taken (and the side effects of the medications), alcohol consumption, and other documented illnesses are not accounted for in Dr. Ziem's conclusion that the Discover Card building caused the Plaintiffs' illnesses.[37] The fatal flaw in Dr. Ziem's temporal association with the building is that she refused to adequately consider, and eliminate, other possible causes of the Plaintiffs' illnesses through a definitive scientific process. The law is not an arena to test scientific theory. *See Rosen*, 78 F.3d at 319. Here, it is clear that there is no known cause of CFS and there are too many analytical gaps in Dr. Ziem's analysis to let her testify before the jury and say that the building caused Plaintiffs' illnesses. Therefore, because there is no known cause of CFS and Dr. Ziem has not provided a consistent diagnostic or scientific methodology to exclude other possible causes of the illness in her temporal analysis, her testimony as to CFS must be excluded.

### 4. *Fibromyalgia*

■ FM is associated with chronic pain and dysregulation of neuroendocrine function and of sleep. Stanley R. Pillemer et al., *The Neuroscience and Endocrinology of Fibromyalgia*, Vol. 40, No. 11, Arthritis & Rheumatism 1928 (1997), Dkt. No. 504, Ex. 70, Article 59.[38] One Court has defined FM as a type of muscular soft-tissue rheumatism that principally affects muscles and their attachment to bones, but which is also commonly accompanied by fatigue, sleep disturbances, changes in

---

37. The Court does not mean to imply that an expert must account for every remote contingency, but the expert must account for flaws in his or her causation analysis through a valid scientific process.

38. Please note that the article number given is simply the Court's best approximation of where the article is located because the articles provided in Dkt. No. 504 are not individually numbered and the articles provided at the end of the packet, including the Pillemer article, are not listed in the bibliography.

mood or thinking, anxiety or depression. *Russell v. UNUM Life Ins. Co.*, D.S.C., 40 F.Supp.2d 747, 751 (1999). Courts, as well as the medical community, recognize that FM is a diagnosable condition. *Id. See also* Aff. of Peter Roca, Dkt. No. 526, Ex. 4.

The question naturally becomes whether or not there was a methodological defect in Dr. Ziem's diagnosis of FM in these three Plaintiffs which would render her diagnosis unreliable. The Defendants' principal argument is that there is no discernable link between the Discover Card building and the Plaintiffs contracting FM because there is no known case of FM.

Some authors, including Dr. Ziem, have argued that there is an overlap between FM, MCS, and CFS. *See* A. Donnay & G. Ziem, *Prevalence and Overlap of Chronic Fatigue Syndrome and Fibromyalgia Syndrome Among 100 New Patients with Multiple Chemical Sensitivity Syndrome*, 5 Journal of Chronic Fatigue Syndrome No. 3/4, 1999, at 71–80 Plaintiffs' Ans. Br. Amended App., Dkt. No. 526, Ex. 18. But even with some medical literature on the subject, there appears to be a consensus that there is no known cause of FM. The Physical Medicine Research Foundation, *The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability,* Journal of Rheumatology 1996 23:3, Dkt. No. 461, Ex. P (illustrating that data regarding the causality of FM are largely absent); National Institute of Arthritis and Musculoskeletal and Skin Diseases, *Questions and Answers About Fibromyalgia,* http://www.nih.gov/niams/healthinfo/fibrofs.htm, Dkt. No. 461, Ex. N ("the cause of fibromyalgia is unknown"). Dr. Howarth, Plaintiffs' expert, testified that medical science does not know what causes FM. *See* Howarth Dep. at 231, Dkt No. 462, *see also* Kaye Dep. at 215, Dkt. No. 463. Similarly, the Fifth Circuit has recently noted that "[e]xperts in the field

conclude that the ultimate cause of fibromyalgia cannot be known and only an educated guess can be made based on the patient's history." *Black v. Food Lion Inc.,* 5th Cir., 171 F.3d 308, 313 (1999).

█ Here, Dr. Ziem opines that the Discover Card building was the cause of Plaintiffs' FM. Dr. Ziem's ultimate opinion that the Discover Card building caused the Plaintiffs' injuries suffers from the same weakness as her testimony that the building caused the Plaintiffs' CFS. That is, she does not follow a logical, scientific, and deductive process to exclude other possible causative factors. "It is well settled that a causation opinion that is based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Rule] 702." *Schmaltz v. Norfolk & Western Railway Co.,* D. Ill., 878 F.Supp. 1119, 1123 (1995). Because Dr. Ziem is attempting to make a temporal connection between the Plaintiffs' illnesses and the building without a specific toxin identified (which admittedly would be difficult to find in this particular factual circumstance), she must demonstrate a deductive scientific process to support her conclusion. As discussed earlier as to Dr. Ziem's diagnosis of CFS, this methodology is lacking as to Dr. Ziem's diagnosis of FM. Again, the Court has been presented with unscientific speculation from a genuine scientist. *Rosen,* 78 F.3d at 318. This sort of speculative testimony in stating that the environmental material in the building was a causal factor in the Plaintiffs' development of FM, without the sufficient exclusion of other causative factors, is precisely the type of testimony that should be kept from the jury under the principles of *Daubert.*

### 5. Reactive Airway Dysfunction Syndrome

█ The parties agree in this case that RADS is a valid scientific diagnosis, and

there are known causes for the illness. The Defendants contend that the diagnosis of RADS should be dismissed because Dr. Ziem's diagnosis of RADS in the Plaintiffs is not relevant nor reliable. The Plaintiffs argue that Dr. Ziem's diagnosis of RADS has sufficient relevance and reliability to be heard by the fact-finder. Plaintiffs argue:

> Dr. Ziem diagnosis [sic] RADS in each patient. (See Facts, P. 17). Dr. Ziem basis [sic] this diagnosis on the long low-level exposure to irritants in the building as well as the literature concerning RADS. Dr. Ziem basis this diagnosis on the medical records, her examination and the long term exposure at the 12 Read's Way building to poor IAQ. Plaintiff urges this is sufficient to discuss the Airway Dysfunction of the plaintiffs (found by all examining physicians) even though defendant's reference has separated RADS as applying to only those individuals who have had a single, large exposure.

Plaintiff's Ans. Br. at 87, Dkt. No. 500.[39]

The Court is inclined to let Dr. Ziem testify as to her RADS diagnosis because it is a known syndrome that has a known cause. RADS appears to be triggered by the sudden onset of asthma following a high-level irritant, gas, vapor, or fume exposure. Stuart M. Brooks et al., *The Spectrum of Irritant–Induced Asthma*, 113 Chest/1/Jan.1998, 42 (1998) (concluding that preexisting allergic/atopy and/or preexisting asthma were significant contributors to the pathogenesis of not-so-sudden, irritant-induced asthma). Dr. Ziem opines that the low level irritants in the building, including the molds and VOC's caused the RADS. From a lay person's point of view, it appears that the RADS diagnosed by Dr. Ziem more closely fits the characteristics of Reactive Airway Initiated Dysfunction Syndrome or RAIDS. RAIDS is defined as:

> a condition, presumably in persons with an allergic or atopic diathesis, whereby asthma symptoms appear to be initiated by a low- or moderate-level exposure to an irritant substance or material in the workplace or environment, and is characterized clinically by the development of asthma symptoms and physiologically by the findings of an atopic status and the presence of non-specific airway hyperresponsiveness.

Stewart M. Brooks, *Reactive Airway Syndromes*, Journal of Occupational Health and Medicine 215 (1992). For RAIDS, the irritant is generally a gas or vapor, but, on occasion, may be in the form of a fume or dust. *Id.* Mr. Brooks, according to the Defendants, was the first to describe RADS in the scientific literature. Defendants' Omnibus Br. at 56, Dkt. No. 451. While Defendants claim that any diagnosis of RADS must have a single high level of exposure, there is at least some indication that illness caused by low-level exposure to toxins can sometimes be characterized as RADS. Some publications have modified the diagnostic criteria for RADS to include asthma after exposures lasting greater than 24 hours. S. Brooks, Y. Hammad, I. Richards, J. Giovibco–Barbas, J. Jenkins, *The Spectrum of Irritant Induced Asthma*, Chest 113, 42 (Jan.1998), Dkt. No. 460

---

**39.** At page 16 of their answering brief, Plaintiffs cite to Exhibits 38 and 70 to support Dr. Ziem's contention that long low level exposure brings the same physical illness and symptoms. The inherent problem with Plaintiffs' citation is that Exhibits 38 and 70 also makeup Volumes II and IV of the appendix. The Court had to search diligently for support for the various propositions offered by the Plaintiffs. The Court would be most thankful if in the future clear pinpoint citations would be given for the arguments made. Certainly, this method of presentation in effect forces the Court to cull through hundreds of pages to find support for its position.

(citing in part Kipen, H.M., Blume R., Hutt, D. *Asthma Experience in an Occupational Environmental Medicine Clinic: Low–Dose Reactive Airways Dysfunction Syndrome*, Journal of Occupational Medicine 1994; 36:1133–37). While the Defendants argue vigorously that the diagnostic criteria for RADS have not been met, there is at least some indication that a valid diagnosis of RADS can be made based on low-level exposures. It is not the duty of the Trial Judge to decide which of several competing theories has the best performance. *Ruiz–Troche*, 161 F.3d at 77. Here, any discrepancy as to the diagnostic criteria for RADS is best cured by cross-examination. Dr. Ziem's opinion does not exist in total isolation.

The Defendants argue with some force that Dr. Ziem's diagnosis of RADS does not show that the Discover Card building caused this illness. But, in the Brooks article provided by the Defendants, there is some mention that dusts can cause Reactive Airway Dysfunction. S. Brooks, Chest 113, 42 (Jan.1998), Dkt. No. 460, (stating that RAIDS can on occasion be caused by dust). By a bare minimum, Plaintiffs have made a sufficient showing that the air quality in the building could have caused RADS. This is an instance where the Court can sort out any discrepancies in the testimony at trial, if necessary. Even for legal purposes of admissibility, there has to be a first time for a causal opinion. The connection here seems close enough and other possible causes can be tested in a trial setting. Any challenge as to the causation of RADS appears at this point to go to the weight and not the admissibility of the evidence. The Court will allow the scientifically valid

diagnosis of RADS to be heard, and will allow Dr. Ziem to testify to her opinion that the Plaintiffs' RADS was caused by the Discover Card building.

### 6. *Toxic Encephalopathy*

 The parties in this suit do not dispute that TE is a valid, scientifically diagnosable condition. Defendants contend that Dr. Ziem's diagnosis and theories of causation on TE do not meet the threshold requirements of relevance and reliability to be heard by the jury.

Chronic TE is defined as an acquired mental impairment, affecting intellect, memory, emotions, and personality. WHO & Nordic Council of Ministers, *Chronic Effects of Organic Solvents on the Central Nervous System and Diagnostic Criteria*, 8 (1985). Chronic TE involves subtle but cumulative brain damage. Cindy Duehring, *Toxic Encephalopathy vs. Alzheimer's*, Our Toxic Times, Vol. 5, No. 8, Dkt. No. 504, Ex. 24. Dr. Ziem defines TE as a long-lasting structural brain dysfunction secondary to an exposure to a chemical or mixture of chemicals interfering with brain function. Ziem Report at 24, Dkt. No. 455.

Defendants claim that Dr. Ziem's diagnosis of TE is invalid because she did not know of the diagnostic criteria for TE. Plaintiffs acknowledge in their brief that Dr. Ziem knew of no specific diagnostic criteria for "brain injuries manifested by cognitive defects," yet "urge that Dr. Ziem can provide an opinion that cognitive defects in each Plaintiff are organic and caused by the chemicals present at the Discover Card Building." Plaintiffs' Ans. Br. at 17, 90, Dkt. No. 500.[40]

---

40. The Court notes that the Plaintiffs' Exhibits in 37 and 39 are not the same exhibits as listed in the Table of Contents of Vol. IV of their answering brief. Furthermore, the Plaintiffs have not provided the Court with specific page references for their assertions.

Additionally, an article listed in the Plaintiffs' bibliography which looks like it would help their cause entitled "Chronic Toxic Encephalopathies Apparently Related to Toxic Exposure" (No. 38) is not included in Dkt. No. 504 where it is supposed to be.

The Court is not inclined to get involved with the details of whether Dr. Ziem's diagnosis of TE followed the appropriate diagnostic criteria. It appears that any defect in her diagnostic method is best cured by cross-examination. It is the ultimate opinion of Dr. Ziem that the volatile organic compounds, dusts, and molds in the building caused the Plaintiffs' TE. Defendants argue that there is no peer reviewed article that supports Dr. Ziem's causation theory. Robert Feldman, however, notes that organic solvents can cause Encephalopathy, and also states that because most organic solvents contain mixtures of ingredients, it is difficult to attribute specific behavioral changes to a specific substance. Robert G. Feldman, *Neurotoxic Disorders*, 179, 186–87 (1988), Dkt. No. 460, Ex. F. Feldman admits that it may be difficult to identify a specific causative agent in the workplace and states chronic solvent exposure can be associated with cognitive changes in an individual. *Id.* at 188. This lends some credence to Dr. Ziem's theory that chemical toxins adhere to dust particles and are carried deep into the lungs. Ziem Report at 26, Dkt. No. 455. Again, by a bare showing, the Plaintiffs have demonstrated that the methodology employed by Dr. Ziem in making the medically valid diagnosis of TE meets the threshold of relevance and reliability as required by *Daubert*.

### 7. Dr. Ziem as a Treating Physician

■ Defendants also seek to exclude any testimony by Dr. Ziem as a treating physician. Plaintiffs argue that Dr. Ziem is a consulting treating physician. Plaintiffs claim that none of the individuals were sent to Dr. Ziem at the request of Plaintiffs' counsel.[41] Plaintiffs go on to state:

> It is clear that during their treatment and during the litigation, these individuals were sent to Dr. Ziem, by their treating physicians, to aid in their treatment with respect to their multiple illnesses.... Although Dr. Ziem has only seen these patients on occasion as a consulting treating physician, she testified that she has talked to the treating physicians of the plaintiffs .... She prescribed various testing to determine the cause of the critical condition of Mrs. Brennan .... Thus, plaintiffs submit that Dr. Ziem is a treating, consulting physician.

Plaintiffs' Ans. Br. at 82, Dkt. No. 500. Since Dr. Ziem is going to be permitted to testify to some extent as an expert, this objection, designed to bar the witness entirely, seems moot. We do not usually worry about qualifying people as non-expert, treating physicians. Indeed, this Judge has questioned whether there is such an animal, insisting on occasion that all treating physicians be listed as experts. But obviously the Plaintiffs have got to be careful in questioning Dr. Ziem in any capacity, and, since the question has been raised, perhaps it will be useful for the Court to set forth its understanding of the facts.

Dr. Ziem only saw Brenda Minner one time and had only one subsequent phone call with her after her initial visit. Dr. Ziem had not received the results of the tests that she had ordered for Ms. Minner, almost a year and a half after the tests were ordered, except for a cholesterol test. Ziem Dep. at 892, Dkt. No. 464. In fact, Dr. Ziem stated that she never spoke with

---

**41.** The record does not reflect that all of the treating physicians sent their patients independently to Dr. Ziem. In fact, Dr. Michell, in his October 13, 1999 deposition, testified that he had never referred any patients to Dr. Ziem and, before this case, he was not familiar with Dr. Ziem. Michell Dep. at 80, Dkt. No. 463.

Ms. Minner's treating physicians. *Id.* at 879. It appears that there was only one letter written to Dr. Michell concerning Ms. Minner following Dr. Ziem's exam. There are many gaps in Dr. Ziem's knowledge about Ms. Minner's medical history. *Id.* at 879–95. This is not typical of a *bona fide* treating physician.

Dr. Ziem saw Mr. Muttart on two occasions, the last occasion being August 19, 1998. *Id.* at 877. As of September 16, 1999, Dr. Ziem admitted that she had not recently treated Mr. Muttart. *Id.* at 898. Dr. Ziem has had no contact with Mr. Muttart's treating physicians in over a year. *Id.* at 895. Similarly, Dr. Ziem has not seen Mrs. Brennan since December 10, 1997, which was the date of her initial visit. *Id.* at 876. Dr. Ziem did, however, have several calls to "coordinate care" after Mrs. Brennan's hospitalization. *Id.* at 874. Dr. Ziem wrote to Dr. Messinger with a summary of her findings as to Mrs. Brennan but never received any communication from Dr. Messinger. *Id.* at 1000. Additionally, Dr. Ziem never spoke to Dr. Seltzer (Mrs. Brennan's allergist) regarding Mrs. Brennan's allergies. *Id.* at 1001. Such limited and sporadic contact with patients who claim to be severely sick certainly does not lead to an inference that Dr. Ziem was intimately involved as a treating physician.

Plaintiffs' characterization of Dr. Ziem as a treating physician seems to have been an alternative attempt to qualify her as an expert. This brings to mind the maxim *quando aliquid prohibetur ex directo, prohibetur et per obliquum*, which means when anything is prohibited directly, it is also prohibited indirectly. Simply, because some of Dr. Ziem's proposed testimony lacks the required relevance and reliability necessary to be presented to the jury as expert testimony, she cannot get in the back door and give her unsubstantiated expert testimony as a treating physi-

cian. Moreover, care should be taken not to overstate Dr. Ziem's limited contact with the Plaintiffs.

In summary, the Court will allow Dr. Ziem to testify as to her diagnoses and theories of causation on RADS and TE. She will not, however, be permitted to testify as to her diagnoses of SBS and MCS because they are not valid medical diagnoses. She also will not be able to give her expert medical opinion that the Plaintiffs' FM and CFS were caused by the building because these conditions have no known etiology and Dr. Ziem has not followed a sufficient scientific methodology in her opinion of causation. Thus, Dr. Ziem can only testify as an expert on limited diagnoses and care must also be taken not to overstate her status as a treating physician.

### B. Dr. Marilyn D. Howarth

Defendants have also filed a Motion in Limine to exclude the expert testimony of Dr. Howarth. The Defendants' Motion seeks to exclude any statements by Dr. Howarth as they relate to the cause or causes of the Plaintiffs' FM and CFS. The Defendants also seek to preclude any testimony by Dr. Howarth concerning the medical validity of a diagnosis of MCS. Finally, the Defendants seek to exclude Dr. Howarth's testimony that the Discover Card building was the causal factor in the Plaintiffs developing migraines, occupational asthma, reactive depression/adjustment disorder, hypertension, chronic sinusitis/sinus infections, allergic sensations, allergic rhinitis, and bowel disturbance.

Dr. Howarth is the director of the Occupational and Environmental Consultative Services for the University of Pennsylvania Health System at Radnor. Dr. Howarth is a graduate of Swarthmore College and received her medical degree in 1986

from the Robert Wood Johnson Medical School. Howarth Curriculum Vitae, Dkt. No. 526, Ex. 1. She has issued expert reports in this case on all three Plaintiffs, which are attached in the record. *See,* Dkt. No. 454. Certainly, Dr. Howath possesses the educational and employment experience to testify in this case. Her opinion in this case, must be rejected in part because some of her medical inquiries are not based on a sound, scientific foundation. For instance, she testified at her deposition that MCS is a scientifically valid diagnosis. She, however, did not diagnose any of the Plaintiffs with MCS. This Court has already determined, largely on the lack of general acceptance, that MCS is not a scientifically valid diagnosis and any attempt by Dr. Howarth to discuss the validity of MCS must be excluded from the jury.

Dr. Howarth did diagnose Linda Brennan and Brenda Minner with CFS. She also diagnosed Ms. Minner with FM. The Defendants seek to preclude Dr. Howarth's testimony solely as to causation, not as to her diagnosis of these conditions. Dr. Howarth indicated at her deposition that there is no known cause of CFS or FM. Howarth Dep. at 229–30, Dkt. No. 462. She also stated that she could not point to any specific microbiological agent in the Discover Card building that caused CFS or FM in any of the three Plaintiffs. *Id.* at 415. ("So am I correct that you cannot point to any specific microbiological agent in the Discover Card building as the cause or one of the causes of chronic fatigue syndrome or fibromyalgia in any of these three patients. A: True").

As stated earlier in this Opinion, there is no known cause of FM or CFS. Without a cognizable or scientific link between her diagnosis of FM and CFS and the Discover Card building, Dr. Howarth must exhibit a valid scientific methodology in developing her opinion that the Discover Card building caused the illnesses. But Dr. Howarth's conclusion that the building somehow caused the Plaintiffs' FM and CFS has significant gaps. She calls the conditions in the building "egregious" but, like Dr. Ziem, does not attempt to show why other factors in the patients' medical histories did not contribute to their illnesses. Indeed, she admits: "I am not able based on the record review alone to exclude other causes as possibly contributing to [Mr. Muttart's] symptoms as well." Howarth, June 4, 1998 Report, Dkt. No. 454. She could not rule out that various other health problems of the Plaintiffs were contributing factors to their illnesses. Howarth Dep. at 501–506, Dkt. No. 462. All and all, it appears that the fatal flaw in Dr. Howarth's temporal analysis is that she did not follow a careful scientific methodology to exclude other possible causes of the Plaintiffs' CFS and FM, two conditions which have no known cause. Therefore, she cannot testify that the building caused the CFS or the FM. An expert opinion cannot be based on the inherent uncertainty of the subject matter or simply on the *ipse dixit* of the expert. *Pfizer,* C.A. No. 97C–04–037. So, to the extent that Dr. Howarth is being offered as an expert with respect to causation of FM and CFS, her testimony must be excluded.

Defendants also attempt to further limit the testimony of "any opinion by Dr. Howarth as to the cause of migraines, occupational asthma, reactive depression/adjustment disorder, hypertension, chronic sinusitis/sinus infections, allergic sensations, allergic rhinitis, and bowel disturbance in the Plaintiffs" because they argue there is no foundation as to causation and therefore Dr. Howath's testimony must be excluded as a matter of law because it is "unreliable and irrelevant." These conditions, however, have known causes, in contrast to CFS and FM. The symptoms, however, bear at least some weight on the

RADS and TE diagnoses. While it is true that Dr. Howarth is not aware of a study that specifically demonstrates that total hydrocarbons at 2.4 parts per million or below is the cause of these deleterious health effects in people, her opinion that the Plaintiffs suffered these effects should be heard. *Id.* at 530. The expert opinion does not have to be determined to be the best, rather, it only needs to meet the threshold requirements of relevance and reliability. Therefore, Defendants' Motion in Limine as to Dr. Howarth's opinions about causation of the Plaintiffs' various illnesses must be DENIED in part and GRANTED in part.

### C. Dr. David W. Messinger

Defendants seek to exclude the testimony of Dr. Messinger. Defendants argue that Dr. Messinger's diagnosis of SBS is unreliable as a matter of law. Defendants also claim that any attempt to link Dr. Messinger's diagnoses of FM, CFS, and SBS to the Discover Card building is unreliable.

Dr. Messinger has been the treating physician of Mrs. Brennan since 1994. Plaintiffs argue that Dr. Messinger's diagnoses of FM, CFS, SBS, and chronic sinusitis are admissible. As previously discussed, there is no universally accepted clinical definition of SBS and no adequate theory for its occurrence. Redlich, et al., *Sick-building Syndrome*, Dkt. No. 504. And, as discussed in the context of the Motion in Limine to exclude the expert testimony of Dr. Ziem, SBS is not a valid medical diagnosis. Therefore, Dr. Messinger cannot present his diagnosis of SBS to the jury.

The Court must then evaluate whether Dr. Messinger has followed an appropriate scientific methodology to determine that the Discover Card building caused FM and CFS in Mrs. Brennan. Here again, that opinion does not appear to be based on appropriate medical methodology because it lacks a credible, scientific foundation. An excerpt provided by the Plaintiffs from Dr. Messinger's deposition testimony shows the flaws in Dr. Messinger's causation analysis.

Q. What fumes do you understand Mrs. Brennan was breathing from the heating and air conditioning system at the building?

A. I think I said fumes and dust. So it would be whatever was in the duct system, heating and air conditioning of the building.

Q. What were those things?

A. Probably an accumulation of material over a period of months and years if they had not been properly maintained . . . .

THE WITNESS: The duct system should be maintained and cleaned on a regular basis. To my understanding, that was not done. There are also fumes from carpets and cleaning materials.

Q: Are you suggesting that the HVAC system, to the extent that it wasn't maintained properly, gave off dust that contained something to which Mrs. Brennan was exposed that caused the conditions that you have described?

A. That was part of it.

Q. What was in the dust to which she was exposed that caused these conditions?

A. I can't give you specifics.

Q. And why is that?

A. Because I don't know.

Messinger Dep. at 20, Dkt. No. 526.

Dr. Messinger admits that he does not know what was in the building that caused these illnesses. He also admits that "[t]here is no demonstrable, reproducible cause of fibromyalgia. There is all kinds

of suppositions. None of them have really stood the test of time." Messinger Dep. at 124, Dkt. No. 463.[42] Thus, Dr. Messinger tacitly admits there is no cognizable link between his diagnosis of FM and the alleged conditions that caused the illness. It is also important to note that it is Dr. Messinger's opinion that the CFS was caused by exposure to fumes and/or dust at the Discover Card building, yet CFS has no known etiology. *Mitchell*, 113 F.3d at 443. If the disease has no known etiology or cause, it is incumbent on the Plaintiffs to identify some chemical component or illustrate some scientifically viable methodology to show that the conditions in the building that could have caused the disease. That was not done here. Therefore, Dr. Messinger's diagnoses and opinions on causation as to FM and CFS must be excluded.

Furthermore, Dr. Messinger has relied on Dr. Ziem's report to bolster his causation opinion on FM and CFS and Dr. Ziem's causation analysis has been excluded as a matter of law as to these opinions. Thus, Plaintiffs have not carried their burden of proof by a preponderance to demonstrate that the causation opinions of Dr. Messinger are sufficiently reliable to be heard by the jury. Dr. Messinger's opinions as to the Discover Card building being the cause of the Ms. Brennan's CFS and FM, two conditions which have no known etiology, are unsupported by sound scientific theory or methodology or by the identification of specific causative agents. The Court will, however, allow Dr. Messinger to testify as to what he feels is the cause of the chronic sinusitis in the Plaintiffs, a disease which has known causes. Therefore, the Defendants' Motion in Limine as to Dr. Messinger is GRANTED in part and DENIED in part.

### D. Dr. Leonard H. Seltzer

■ Dr. Seltzer has treated all three Plaintiffs in this case. Specifically in their Motions in Limine, Defendants argue that Dr. Seltzer's testimony on SBS and RADS should be excluded, both from a diagnostic and a causation perspective. The Defendants further argue that Dr. Seltzer is not qualified to testify concerning his diagnosis and causational links as to CFS. Finally, the Defendants seek to exclude any testimony of Dr. Seltzer that states that the Discover Card building somehow caused upper respiratory allergy, rhinitis, bronchitis, sluggish immune system, sinus infections or congestion, the flu, or depression.

In Plaintiffs' Answering Brief, the Plaintiffs contend that they are not relying on Dr. Seltzer for a diagnosis of FM or CFS as they relate to Mrs. Brennan. Rather, Plaintiffs state that they plan to use Dr. Seltzer to testify that there is a temporal relationship between sinusitis and allergy with respect to individuals who work at the building. Thus, Plaintiffs argue that they "do not oppose most of the motions with respect to Dr. Seltzer, as they relate to Mrs. Brennan." Plaintiffs' Ans. Br. at 71, Dkt. No. 500.

As to Mr. Muttart, Plaintiffs state that Dr. Seltzer is not being put forth as a causation expert. Plaintiffs want to use Dr. Seltzer with respect to bad air quality, which he relates to SBS As to Ms. Minner, the Plaintiffs seek to present Dr. Seltzer's testimony not to opine on specific causation, but rather to testify to the diseases he found that Ms. Minner had in 1994.

Plaintiffs' explanation of how they plan to use Dr. Seltzer at trial is, at best, cryptic. It appears that Plaintiffs have conceded that Dr. Seltzer is not qualified

**42.** Another one of the Plaintiffs' experts, Dr. Seltzer, admits that there is no known cause of FM. Seltzer Dep. at 93, Dkt. No. 521.

to testify concerning causation of SBS and CFS. Dr. Seltzer candidly admits that he is not an expert on "sick buildings" and does not hold himself out to be an expert. Seltzer Dep. at 81, Dkt. No. 464.[43] Therefore, he cannot give a causation opinion as to SBS because he admits that there are flaws in his causation analysis. This Court has held that SBS is not a valid medical diagnosis. Additionally, Dr. Seltzer cannot testify as to CFS because there is no sufficient causal connection established between the building and the patients.

Dr. Seltzer opined as to Mr. Muttart that he suffered from RADS when he examined him and the RADS was caused by mold, bad air, a virus, or continued smoking. While the Defendants seek to exclude his RADS diagnosis, nothing provided by the Defendants precludes Dr. Seltzer from testifying as to his diagnosis of RADS or any of the secondary diagnosis of upper respiratory allergy, rhinitis, bronchitis, sluggish immune system, sinus infections or congestion, the flu, or depression. Any problems with his diagnoses or diagnostic criteria are better left to the trier of fact. Dr. Seltzer should be allowed to testify as to the valid diagnoses that he made as to all three of these Plaintiffs, but his testimony should be limited to his diagnoses. Dr. Seltzer, however, cannot be used as a causation expert.[44] Therefore, Defendants' Motion in Limine to limit the testimony of Dr. Selzer is GRANTED in part and DENIED in part.

### E. Dr. Theodore W. Michell

■ Dr. Michell is the treating physician for both Ms. Minner and Mr. Muttart. He has diagnosed or adopted the diagnosis of other treating physicians of SBS, FM, CFS, MCS [45] and TE. The Defendants ask this Court to exclude the expert testimony of Dr. Michell because he is not qualified to testify as to his diagnoses of SBS, FM and CFS.[46]

To begin with, as to the FM and the CFS, the Court has determined that there are no known causes. *Black*, 171 F.3d at 313(FM); *Mitchell*, 113 F.3d at 443(CFS). Therefore, any testimony relating to the Discover Card building causing FM or CFS must be excluded and Dr. Michell does not have the qualifications to testify as to causation, nor has he performed a sufficient scientific inquiry to exclude other causes of the illnesses. Plaintiffs tacitly agree that there is no causative agent identified in Dr. Michell's testimony and report which would link the illnesses of either Ms. Minner or Mr. Muttart to the building because Plaintiffs state they are not offering Dr. Michell with respect to causation on FM or CFS. Therefore, the Motion in Limine is GRANTED as to all of Dr. Michell's expert testimony on MCS, SBS, FM, and CFS.[47]

### F. Dr. Neil S. Kaye

■ The Defendants also challenge the admissibility of the testimony of Dr. Kaye as it relates to his medical diagnoses of

---

**43.** Plaintiffs state uncategorically that they do not list Dr. Seltzer as an expert on SBS. Plaintiffs' Ans. Br., 70–71.

**44.** It does not appear that Plaintiffs are offering Dr. Seltzer as a causation expert in any way. Therefore, the Motion is Limine should be GRANTED and any opinion as to causation offered by Dr. Seltzer will be excluded.

**45.** MCS and SBS are not valid medical diagnoses for purposes of this case.

**46.** In Dr. Michell's deposition, he appears to adopt the diagnoses of TE and MCS made by Dr. Ziem as to Ms. Minner. *See* Michell Dep. at 116–118, Dkt. No. 463.

**47.** This ruling as it relates to Dr. Michell probably is not of great consequence because Dr. Michell defers to Dr. Roca's diagnosis as it relates to FM and to the consultant specialist as it related to the diagnosis of CFS. Michell Dep. at 13, 57, Dkt. No. 463.

SBS, TE and CFS.[48] Defendants also claim that Dr. Kaye's causation analysis is flawed as a matter of law as he relates the Plaintiffs' CFS, FM, and SBS to the conditions at the Discover Card building.

 Dr. Kaye is a board certified psychiatrist in private practice with an emphasis on adult forensic psychopharmacology, neuropsychiatry, geriatric psychiatry, drug research, and clinical testing. Curriculum Vitae of Dr. Kaye, Dkt. No. 526, Ex. 1. Dr. Kaye, as a self-described neuropsychologist,[49] is not board certified in internal medicine, toxicology, neurology, occupational, or environmental medicine. In fact, he is a board certified psychiatrist. While his specialty does not preclude physical diagnoses, it certainly weighs against his credibility when dealing with fringe areas of other specialties.

As discussed at length earlier in this Opinion, the diagnosis of SBS is not proper because there is insufficient diagnostic criteria available to make a diagnosis. Therefore, Dr. Kaye cannot opine that any of the Plaintiffs have SBS, or relate the Plaintiffs' alleged SBS symptoms to the Discover Card building.

Also, as discussed earlier in this Opinion, there are no known causes of CFS or FM. Dr. Kaye, similarly to the other experts, cannot identify a causative agent in the Discover Card building to which the Plaintiffs may have been exposed which would have triggered their illnesses. Kaye Dep. at 744–45, Dkt. No. 463. Dr. Kaye sets forth an extensive review of the medical records of the Plaintiffs in his report, but he does not attempt to set forth a careful, scientific methodology excluding other possible causes of the Plaintiffs' CFS and FM.

Furthermore, it appears that this type of causation analysis by Dr. Kaye in an attempt to link the Plaintiffs' FM or CFS to the building would be outside his field of expertise. Therefore, any diagnosis that attempts to link the Plaintiffs' CFS or FM to the Discover Card building is unreliable as a matter of law. Simply, Dr. Kaye did not employ a methodology sufficient to create a credible link between the building conditions to make a temporal connection to the Plaintiffs' FM and CFS.

Defendants also attempt to exclude Dr. Kaye's diagnosis of TE in Mr. Muttart. It appears that such a diagnosis by a board certified psychiatrist is proper. Dr. Kaye, as a qualified psychiatrist, certainly can give his findings concerning neurocognitive deficit found in all three Plaintiffs. The Defendants' claims that Dr. Kaye did not follow appropriate diagnostic criteria are best cured by cross-examination. Therefore, the Motion in Limine to exclude the testimony of Dr. Kaye is DENIED in part and GRANTED in part.

## G. Dr. Richard G. Ivins

 Dr. Ivins is a neuropsychologist, who evaluated all three Plaintiffs for neuro-psychological defects. Dr. Ivins diagnosed impairment in all three Plaintiffs and related that impairment to long-term exposure to the Discover Card building. The Defendants argue that Dr. Ivins' diagnoses are too speculative to be heard by the jury and are unreliable as a matter of law. Defendants admit that Dr. Ivins has subjected the Plaintiffs to a battery of neuro-psychological tests, but argue that there are sufficient flaws in his method of interpreting neuropsychological tests.

---

**48.** Indeed, Dr. Kaye, like the other doctors, is unaware of a definition for SBS, or a causal agent for SBS, and is unaware of any published criteria for diagnosing SBS. Kaye Dep. at 760–61, Dkt. No. 463.

**49.** Dr. Kaye testified that there is no board certification in neuropsychiatry as yet, but notes there will be such certification in the not-so-distant future. Kaye Dep. at 397, Dkt. No. 463.

The Defendants further seek to limit Dr. Ivins' causation opinions, arguing that Dr. Ivins lacks the qualifications to testify as to the cause of Plaintiffs' neuropsychological conditions. The Defendants also argue that Dr. Ivins' causation opinions are unreliable and irrelevant.

Dr. Ivins is certainly able, as a licensed psychologist, to make a diagnosis of impairment in the Plaintiffs. Dr. Ivins received his Doctorate in 1974 from the University of Southern Mississippi and is a member of various neuropsychological organizations. It appears that any problems with his diagnosis of impairment are best cured by cross-examination and not by exclusion by this Court from the outset.[50] The Defendants admit that Dr. Ivins is qualified to administer and score neuropsychological tests. And, upon review of the documents submitted, the Court must agree with the Plaintiffs that it appears that the method of testing used was proper, and that if the Defendants wish to challenge Dr. Ivins' conclusions, that is an issue of weight and not the admissibility of the testimony. Dr. Ivins is testifying as to the level of impairment in the Plaintiffs. Therefore, the Defendants' Motion in Limine as it relates to Dr. Ivins' diagnosis of impairment is DENIED.

It appears, however, that beyond the diagnosis of impairment, Dr. Ivins' views as to causation are flawed. There is a general problem with the extent to which a psychologist should be permitted to testify as to medical cause. Dr. Ivins cannot opine that the Discover Card building caused the injuries because he offers virtually no facts to support his theory that the Plaintiffs suffered a toxic exposure in the Discover Card building. He has no idea what substance in the building allegedly caused the impairment in the Plaintiffs. Ivins Dep. at 625–28, Defendants' Dep. Appendix, Dkt. No. 462. Dr. Ivins has no idea what may have caused the defects nor how long the Plaintiffs may have been exposed to the materials. *Id.* When asked from what source he obtained his information that Ms. Minner had a prolonged exposure to chemicals at work, Dr. Ivins responded that he got the information from her former attorney. *Id.* at 591. Dr. Ivins does not go through a detailed scientific method and procedure to exclude other possible causes. Dr. Ivins simply makes statements without having the proper foundation to support his causation analysis.

Plaintiffs make a half-hearted attempt to state that Dr. Ivins' determination of causation was made by ruling out any other general brain injuries. That testimony might normally be admissible, but contrary to the Plaintiffs' argument, Dr. Ivins' ultimate statements as to cause are merely lay conclusions with, at best, a limited factual basis. There is an insufficient factual underpinning in Dr. Ivins' testimony to support his causation analysis. Therefore, the Motion in Limine as to Dr. Ivins' diagnosis of impairment and his diagnostic techniques is DENIED but the Motion is GRANTED as to Dr. Ivins' opinion that unidentified chemicals in the Discover Card building caused the cognitive deficit.

### H. *Dr. Neil Jurinski*

Dr. Jurinski is a Certified Industrial Hygienist who has been hired by the Plaintiffs to evaluate the air quality reports of the Discover Card building. Dr. Jurinski received his Ph.D. from the University of Mississippi and is certified as

---

50. The Defendants assert that there are significant flaws in Dr. Ivins' diagnosis because he relies on his "gut feeling" and his "sixth sense." Defendants also assert that Dr. Ivins did not have an accurate baseline for his neuropsychological testing because he did not take an accurate background.

an Industrial Hygienist by the Board of Industrial Hygiene. The Defendants contend that Dr. Jurinski's testimony that third-floor overcrowding caused poor ventilation is unreliable because he admits the building complied with ASHRAE standards. Defendants also argue that Dr. Jurinski is unqualified to testify about the health effects of indoor quality on the Plaintiffs.

 It is not necessary that an expert report have an undisputed foundation, it need only be based on valid reasoning and reliable methodology. *Kannankeril*, 128 F.3d at 806. The fact that the Defendants do not agree with Dr. Jurinski's opinion is of no consequence as to admissibility. Dr. Jurinski opines generally that, based on inadequate air quality, there appeared to have been overcrowding of the building. Dr. Jurinski's opinions meet the threshold requirements to be heard by the jury. Certainly, Dr. Jurinski is qualified to give his testimony about the air quality components. Again, any alleged shortcomings in his testimony are best cured by cross-examination.

It appears, however, that the Defendants are concerned that Dr. Jurinski is attempting to opine that the Discover Card building caused the medical illnesses of the Plaintiffs. But, Dr. Jurinski admits that he lacks the medical training necessary to testify as to a medical causation for the injuries. Jurinski Dep. at 106, Dkt. No. 462. He recognizes that there have been many contaminants identified as present in buildings but he cannot identify a cause and effect relationship between contaminants and any specific health symptoms. *Id.* at 45. Therefore, any attempt by the Plaintiffs to have Dr. Jurinski make a medical link between the alleged poor maintenance of the building and the Plain-

tiffs' physical complaints and injuries must be excluded because Dr. Jurinski is not a medical doctor trained to make the connection. Additionally, he, like some of the other experts, cannot identify a causative link between the building and the Plaintiffs' diagnoses. Thus, the Defendants' Motion in Limine to exclude the expert testimony of Dr. Neal Jurinski is DENIED in part and GRANTED in part.

### I. Dr. Paul M. Imber

 Defendants seek to limit the testimony of Dr. Imber, an ear, nose, and throat doctor who is a treating physician for Mrs. Brennan. He has diagnosed Mrs. Brennan with chronic rhinosinusitis. The heart of the Defendants' Motion concerning Dr. Imber is that they do no believe that Dr. Imber should be able to testify as to the cause of SBS. Plaintiffs aptly point out that Dr. Imber does not purport to be an expert on SBS. Imber Dep. at 7, Dkt. No. 527, Ex. 57. Dr. Imber does not attempt to relate Mrs. Brennan's condition to the building and recognizes that, without cultures or viral studies, one cannot empirically say that SBS is a definitive diagnosis. *Id.* at 11, 12. The Plaintiffs also point out that Dr. Imber never diagnosed SBS in anyone. *Id.*

The Defendants also ask this Court to exclude any testimony by Dr. Imber that the building caused the chronic rhinosinusitis. Again, the Plaintiffs correctly point out that Dr. Imber never testified that the building was the cause of Mrs. Brennan's problems. *Id.* at 33; Plaintiffs' Ans. Br. at 79, Dkt. No. 500.[51] Certainly, the Plaintiffs are not offering Dr. Imber as an expert on SBS. And the facts are clear that Dr. Imber does not opine that Mrs. Brennan's chronic rhinosinusitis was

---

51. In fact, Dr. Imber stated that there was no known cause for her sinus problems. He testified "in Mrs. Brennan's case, we will never find a singular smoking gun." Imber Dep. at 7, Dkt. No. 527, Ex. 57.

caused solely by the Discover Card building. Imber Dep. at 39–40, Dkt. No. 527, Ex. 57. Dr. Imber is qualified to give his opinion as to the diagnosis of chronic rhinosinusitis if evidence is adduced that creates the causal link to the building. Dr. Imber is certainly qualified to give his diagnostic opinion before the jury. Therefore, the Motion in Limine to limit the testimony of Dr. Imber is DENIED.

### J. Dr. Jay G. Weisberg

■ Dr. Weisberg is a psychiatrist who treats Ms. Minner and has diagnosed her with depression. He first diagnosed Ms. Minner with depression in 1997. Weisberg Dep. at 352, Dkt. Nos. 464 & 521.

My opinion is that her psychiatric illness is caused by her physical condition, and that she has been diagnosed as having—by several physicians, as having fibromyalgia. She has been diagnosed by a few physicians at least as having sick-building syndrome. If that Sick Building Syndrome causes the fibromyalgia, then, in that case, I do feel that working in the building has caused her depression, if that is the—if that's the sequence of how things occurred.

Q. Do you feel you have the expertise to reach that opinion yourself; that is, that Sick Building Syndrome, in fact, causes chronic fatigue syndrome?

A. No, I do not.

*Id.* at 355.

The Defendants seek to exclude or limit any opinion that Dr. Weisberg might give as to the alleged cause of Mrs. Brennan's claimed CFS, FM, and SBS.[52] Dr. Weisberg states uncategorically that he has no expertise to give an opinion as to the caus-

ative factors of CFS, SBS, and FM. But, it appears a bit far fetched to exclude Dr. Weisberg's psychological testimony that Mrs. Brennan's physical symptoms caused her continuing depression. Although he accepts the diagnoses of SBS, CFS, and FM by the other doctors, he opines ultimately that he believes Mrs. Brennan's depression is based on her physical condition. Dr. Weisberg cannot give an opinion as to what caused Mrs. Brennan's physical symptoms, but he is certainly qualified to link her depression to her physical symptoms if the underlying physical diagnoses are found valid by the jury. Therefore, the Defendants' Motion in Limine to exclude the expert testimony of Dr. Weisberg is DENIED.

For the most part, the problem with the Plaintiffs' medical experts is that they make unsupported jumps as to causation and then ask the Court to make an unwarranted and unwise leap of faith. A medical expert may not speculate as to the possible medical causes or consequences, and must limit the testimony to causes or consequences that are reasonably probable. David L. Finger & Louis J. Finger, *Delaware Trial Handbook,* § 18:4 (1994). In this case, with limited evidence of causation, as to the diagnoses of SBS, MCS, FM, and CFS, the jury would be forced to speculate how any building defect may have caused the Plaintiffs' specific injuries. *See Mazda Motor Corp. v. Lindahl,* Del. Supr., 706 A.2d 526, 533 (1998). Such speculation is precisely what a Trial Judge is supposed to screen out when exercising his gatekeeping role under *Daubert.*

A further question arises. Of course, given the Court's ruling herein, MCS and SBS are out of the case. Unlike MCS and

**52.** This Court has already held that there are no universally accepted criteria for SBS and SBS is not a valid diagnosis. Therefore, any diagnosis of SBS must be excluded as a matter of law. Additionally, Dr. Weisbert cannot testify as to CFS and FM because there is no causal link established. But he can state that Mrs. Brennan's depression is related to her physical symptoms.

SBS, CFS and FM are diagnosable diseases without known causes. The question arises as to how to handle them at trial. It seems to the Court that any them should be excluded. They cannot be used to make the Plaintiffs' case in the absence of legally permitted evidence of causation. And, under the circumstances of this case, they should not be allowed to be used defensively either. It would be very misleading to permit the Defendants to confuse the jury by making an unproven causal connection a defensive sword in the form of an alternative explanation for Plaintiffs' illness. Therefore, the Court is inclined to exclude any mention of CFS and FM in addition to MCS and SBS.

## II. Plaintiffs' Motions to Exclude Experts

The Court now turns to the Plaintiffs' Motions to exclude the testimony of the Defendants' expert witnesses. Thankfully, there are only two.

### A. Dr. Sue E. Antell

■■■■■ Dr. Antell is a licensed neuropsychologist employed as an expert by the Defendants. Plaintiffs do not dispute that Dr. Antell is a qualified expert in the field of neuropsychology; rather, Plaintiffs argue that Dr. Antell did not follow the proper cognitive forensic neuropsychological testing methods in arriving at her opin-

ion. In short, it appears that the Plaintiffs dispute the "methodology" that Dr. Antell used in creating her report.

Dr. Antell examined Minner, Muttart, and Brennan and prepared a report concerning each of the named Plaintiffs in this case.[53] Plaintiffs present slightly different objections to Dr. Antell's reports prepared for the individual patients, so the Court will address the objections in turn.

### 1. Dr. Antell's Report as to Mr. Muttart

As to Mr. Muttart's testing, Plaintiffs argue that Dr. Antell did not employ the proper scope of tests to establish a reliable basis to predict a neurological deficit. Plaintiffs also argue that in one of the tests, WAIS–III, Dr. Antell did not provide the Plaintiffs with the raw data necessary to independently evaluate Mr. Muttart's neurocognitive ability.[54] Plaintiffs also question the reliability of the WAIS–III test because of its newness. In support of their position, Plaintiffs have filed the affidavit of Dr. Jim Hom.[55] Dr. Hom states that Dr. Antell's methods of scoring and administering these tests, as well as the tests chosen, are not those that should be used in a neuropsychological forensic setting to determine cognitive defects.

In Dr. Antell's report, she states: "Many of [Mr. Muttart's] behaviors were

---

53. Those reports are included in the record in Plaintiffs' Motion to Exclude the Testimony of Dr. Antell and Dr. Mechanick, Dkt. No. 438, Exs. A, B, and C. For Muttart's report, *see* Appendix to Ex. to Defendants' Opposition to Plaintiffs' Motion in Limine to Exclude Certain Testimony of Dr. Antell, Dkt. No. 493, Tab 3.

54. In her affidavit, Dr. Antell states that she did not need to record verbatim the test results for the WAIS–III test. She states that she performed the test with the manual open in front of her and the scoring system she used is specifically endorsed in the manual on page 11. Antell Aff. ¶ 12, Dkt. No. 493, Ex. 6.

55. The Defendants have filed a Motion to Strike the Affidavit of Dr. Hom (Dkt. No. 491), claiming that Dr. Hom was not one of the expert witnesses identified and they have not had the opportunity to depose him. The Court agrees that the Plaintiffs cannot use a backdoor method to get an additional expert report into evidence. This expert cannot opine by affidavit about the techniques of Dr. Antell without being identified at any time before the Motion in Limine. But, while the Motion should logically be granted, the Court has considered the affidavit of Dr. Hom. For purposes of these Motions, the Court considers the Motion to Strike as MOOT.

consistent with those seen in patients who are feigning illness or symptoms but are not consistent with the true injury." Muttart Report at 3. The report goes on to state that Dr. Ivins (the Plaintiffs' expert) used extremely out-of-date tests which should not be considered valid measures. *Id.* at 3. Dr. Antell noted that Mr. Muttart did considerably better on the tests performed by the Plaintiffs' expert, Dr. Ivins. *Id.* at 4. Dr. Antell's ultimate conclusion in her evaluation of Mr. Muttart was that he has "no true neurocognitive symptoms and that the symptoms that he does demonstrate are likely to be feigned or malingered." *Id.* at 6.

The dispute in this instance seems to center around whether or not Dr. Antell should have used a "fixed" battery of tests or whether or not it was acceptable to use a "flexible" battery of tests. While the Plaintiffs argue that the "fixed" tests are the better tests to be used in diagnosis of disease, the "flexible" approach appears to be an acceptable method for the evaluation of patients.

> A fixed battery test, such as the Halstead–Reitan battery, may be overly time consuming and leaves little room for in-depth testing in areas of specific deficits. In our practice, the selection of tests for a given client is often open-ended, i.e., not all tests to be given in a particular case are determined in advance. Rather, some basic tests are given first ... [and][f]urther tests are selected after a review of the results of the broad-band initial testing.[56]

Otfried Spreen & Ester Strauss, *A Compendium of Neuropsychological Tests 2d,* Ch.2 at 11; *see also* Muriel D. Lezak, *Neuropsychological Assessment 2d.,* at 107 (advocating an examiner should begin with a basic battery of tests that touches on the major dimensions of intellectual behavior and the examiner may need to go outside the basic battery and use techniques relevant to this specific patient at this specific time).

Certainly the information in the record indicates that Dr. Antell's flexible approach has at least a reliable basis. In their reply brief, Plaintiffs admit that almost all psychiatrists use a flexible battery of tests. Plaintiffs' Reply Br. at 8. The methodology employed by Dr. Antell, as it applied to Mr. Muttart, is certainly not flawed to the point of exclusion. Whether or not Dr. Antell's opinion has the best foundation must be left to the trier of fact. *See Kannankeril,* 128 F.3d at 806. Her results are sufficiently reliable for admissibility and it appears that she based her initial results on a sufficient battery of tests, as required by Spreen and Strauss. *See* Antell Aff. at 2, Dkt. No. 493, at Ex. 6. And the claim that Dr. Antell did not save the raw data from which she based her results is of no consequence as to admissibility. Plaintiffs cite no authority requiring Dr. Antell to record verbatim all responses. Despite the Plaintiffs' protestations concerning the scored responses, Dr. Antell's recording method seems sufficient. Therefore, the Motion in Limine to exclude the expert testimony of Dr. Antell as it relates to Mr. Muttart is DENIED.

### 2. Dr. Antell's Report Concerning Brenda Minner

▇ Plaintiffs argue that Dr. Antell's underlying methodology in determining whether or not Ms. Minner has any neurocognitive defects was unreliable. Plaintiffs contend that the tests were not meant to be used to detect a cognitive deficiency.

---

**56.** According to a survey of 279 neuropsychologist in 1994, the use of the fixed battery test has dwindled to 14% and all other clinicians use the flexible approach. Spreen & Strauss at 11.

However, as discussed above, Dr. Antell's methodology is reliable. Any dispute about a foundational defect can be more appropriately tested by cross-examination. Dr. Antell's report is certainly relevant to the case and is based in sufficiently reliable data to be heard by the jury. Therefore, the Motion to exclude the expert testimony of Dr. Antell as it relates to Brenda Minner is DENIED.

### 3. Dr. Antell's Report Concerning Linda Brennan

Plaintiffs make basically the same arguments with regard to the relevancy and reliability of Dr. Antell's report concerning Linda Brennan as were made concerning Mr. Muttart and Ms. Minner. Therefore, the Motion to exclude the expert testimony of Dr. Antell as it relates to Linda Brennan is DENIED.

In addition, Plaintiffs argue that a portion of Dr. Antell's report as to Mrs. Brennan should be excluded because Dr. Antell states on page 5 of her report that:

Given the intensity, frequency, and variety of complaints and the strong possibility that there is exaggeration of symptoms, a Factitious Disorder cannot be ruled out. Indeed with this history of multiple invasive medical procedures,a history of Munchausen's Disorder may be appropriate although there is no evidence that Mrs. Brennan intentionally inflicted any illness or disorder upon herself.

The Plaintiffs state that any reference to Munchausen's Disorder[57] may cause the

jury to believe that Mrs. Brennan somehow self-inflicted her illness. *See* Plaintiffs' Br. to Exclude the Testimony of Dr. Antell and Dr. Mechanick at 17, Dkt. No. 438. Plaintiffs also state, without a record citation, that Dr. Antell specifically stated at her deposition that she cannot make a diagnosis of Munchausen's Disorder. *Id.* It is the overall opinion of Dr. Antell that there is no objective confirmation of any of the complaints of neurocognitive dysfunction as to Mrs. Brennan. Brennan Report at 5. There is no allegation in Dr. Antell's report that Mrs. Brennan self-inflicted her illness. Therefore, it appears premature to rule on this point in the context of a Motion in Limine. But it appears that Mrs. Brennan's position is well taken as to any suggestion of Munchausen's Disorder being unsupported by a factual predicate; the best way not to mislead the jury would be not to mention Munchausen's Disorder.

For the foregoing reasons, the Plaintiffs' Motion to exclude the expert testimony and reports of Dr. Antell as they relate to Muttart, Minner, and Brennan is DENIED. IT IS SO ORDERED.

### B. Dr. Stephen Mechanick

 The Plaintiffs seeks to limit the testimony and conclusions of Dr. Mechanick based in part on the fact that he relies to a great extent on Dr. Antell's neurological examination.[58] But, because the testimony and reports of Dr. Antell are not improper or deficient, any exclusion based on Dr. Mechanick's reliance on Dr. Antell's reports is DENIED.[59]

---

**57.** Munchausen's Syndrome is "a condition characterized by habitual presentation for hospital treatment of an apparent acute illness, the patient giving plausible and dramatic history, all of which is false." *Dorland's Illustrated Medical Dictionary* at 1295 (26th ed.1981).

**58.** Normally if the underlying factual basis of an expert is so lacking in probative force that

no reasonable expert could base an opinion on it, then the expert report must be excluded. *See Pfizer,* C.A. No. 97C–04–037.

**59.** Plaintiffs do not dispute from a psychiatrist's point of view that Dr. Mechanick did an exhaustive analysis of the symptoms and the medical records. Plaintiffs, however, dispute the methodology of Dr. Mechanick's testimony.

Plaintiffs further argue that Dr. Mechanick's methods in reaching the diagnosis of Undifferentiated Somatoform Disorder for Mrs. Brennan, Ms. Minner, and Mr. Muttart are unreliable. As for Mrs. Brennan, the Plaintiffs claim that Dr. Mechanick did not perform a proper differential diagnosis and the diagnoses of CFS and FM (diagnosed by her treating physicians) were correct. Dr. Mechanick opines that:

> Mrs. Brennan's symptoms such as fatigue, loss of appetite, excessive sleeping, insomnia, headaches, double vision, and difficulty focusing are not explained by Mrs. Brennan's employment at the Discover Card building. The presence of these symptoms, which are not fully explained by any known general medical condition warrant a diagnosis of Undifferentiated Somatoform Disorder.

Brennan Report at 39–40, Dkt. No. 495, Ex 1.

In the context of a Motion in Limine, the Court is not in a position to pick and choose which diagnosis from competing experts is correct. Surely there will be defense evidence to the effect that the Discover Card building did not cause Mrs. Brennan's symptoms. The Court must only evaluate if the diagnosis is based on relevant and reliable information and is based on sound methodology. Plaintiffs have only come forth with conflicting testimony concerning the diagnosis of Mrs. Brennan. Nothing has been produced that undermines the basis of Dr. Mechanick's opinion as it relates to Mrs. Brennan. Therefore, Plaintiffs' Motion to exclude the expert testimony as it relates Dr. Mechanick's report and testimony concerning Mrs. Brennan is DENIED.

Plaintiffs next argue that it is inconsistent for Dr. Mechanick to diagnose Undifferentiated Somatoform Disorder and Malingering simultaneously.[60] In support of that argument, Plaintiffs cite the Affidavit of Dr. Neil Kaye, who opines that it is inherently illogical and contradicting to simultaneously diagnose Undifferentiated Somatoform Disorder and Malingering. Kaye Aff. at ¶ 3, Dkt. No. 438, Ex. 26. It is also the opinion of Dr. Kaye that Dr. Mechanick did not apply the proper criteria in his differential diagnosis. *Id.* at ¶ 4.

Some definitions are in order. Somatization Disorder is a polybutylene symptomatic disorder that begins before the age of 30 years, extends over a period of years, and is characterized by a combination of pain, gastrointestinal, sexual, and pseudo-neurological symptoms. *Diagnostic and Statistical Manual of Mental Disorders* at 445 (4th ed.1994), Dkt. No. 495, Ex. 5. Undifferentiated Somatoform Disorder is characterized by unexplained physical complaints, lasting at least 6 months, that are below the threshold for a diagnosis of Somatization Disorder. *Id.* This text goes on to state that: "In contrast to Undifferentiated Somatoform Disorder, the physical symptoms of Factitious Disorders and Malingering are intentionally produced or feigned." *Id.* at 551. The same text, however, goes on to state:

> In Factitious Disorder With Predominantly Physical Signs and Symptoms and Malingering, somatic symptoms may be intentionally produced to assume the sick role for gain, respectively. Symptoms that are intentionally produced should not count toward a diagnosis of Somatization Disorder. However, the presence of some factitious or malingered symptoms, mixed with other nonintentional symptoms, is not uncommon. *In such mixed cases, both Somatization Disorder and a Factitious*

---

**60.** Dr. Mechanick made this dual diagnosis for both Mr. Muttart and Ms. Minner.

*Disorder or Malingering should be diagnosed.*

*Id.* at 449 (emphasis supplied).

This text shows that there is a factual and scientific basis for Dr. Mechanick's seemingly inconsistent diagnosis. Therefore, the jury should decide what effect to give his testimony. There is a sufficient indicia of reliability to support the evidentiary reliability of Dr. Mechanick's testimony. The decision concerning whether the diagnoses of Plaintiffs' experts or the Defendants' experts are to be believed should be left to the trier of fact. Thus, the Motion in Limine to exclude Dr. Mechanick's testimony is DENIED.

### CONCLUSION

For the foregoing reasons, the Defendants' Motions in Limine to exclude the testimony of Doctors Ziem, Howarth, Messinger, Seltzer, Kaye, Ivins, and Jurinski are DENIED in part and GRANTED in part, and the Motions in Limine to exclude the testimony of Doctors Weisberg and Imber are DENIED. Defendants' Motion in Limine as to Dr. Michell is GRANTED. The Plaintiffs' Motions in Limine to exclude the expert testimony of Doctors Antell and Mechanick are DENIED. IT IS SO ORDERED.

This Opinion will probably not make either side happy. But it seems to the Court that is consistent with the healthy skepticism with which the Courts have historically greeted expert testimony. The fringe has been eliminated. At the same time, the Opinion does not foreclose a case on the frontier of medical exploration. My hope is that the decision, after the examination by counsel, will provide a useful and orderly framework in which the litigation can proceed. Whether it does or not is, of course, somewhat dependent upon the value of the Court's Opinion. But I suspect it is even more dependent upon counsel's willingness to accept the framework and to participate within its bounds. If the case goes this route, we have a long way to go.